BURTON M. CROSS
*vs.*
GUY GANNETT PUBLISHING CO.

Kennebec.    Opinion, February 16, 1956.

*McLean, Southard & Hunt,* for plaintiff.

*Berman, Berman & Wernick,*
*Goodspeed and Goodspeed,* for defendant.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, TAPLEY, CLARKE, JJ.

WEBBER, J. This was an action of libel brought by the plaintiff, a former Governor of Maine, against the defendant company, which publishes several daily newspapers in this state. The defendant filed a general demurrer to the plaintiff's declaration which was overruled below. Defendant's exceptions bring the matter before us.

The defendant asserts as one ground of demurrer that the declaration is fatally defective in that it fails to allege that the statement was published of and concerning the facts and circumstances set forth in the inducement. Where words used in an allegedly libelous statement are not defamatory *per se*, the plaintiff may yet show the defamatory nature of the statement when viewed against a background of certain other extrinsic matter or circumstances. The averment of these other relevant circumstances (the inducement) must be in traversable form and must be linked to the statement itself by further traversable allegations that the statement was made of and concerning the matters set forth in the inducement. The averment which effectively performs this linking operation is known as the colloquium. The colloquium also performs the function of linking the statement to the plaintiff as the person defamed thereby. Whenever a colloquium is required to relate the statement to the inducement, failure to set forth such colloquium in proper and traversable form will render a declaration in an action of libel demurrable. *Niehoff* v. *Sahagian*, 149 Me. 396; *Niehoff* v. *Congress Square Hotel Co.*, 149 Me. 412. However, when the published words are libelous *per se*, neither inducement nor colloquium are required. See *Niehoff* v. *Sahagian, supra; Niehoff* v. *Congress Square Hotel Co., supra; Brown* v. *Rouillard*, 117 Me. 55; 53 C. J. S. 247, Sec. 162b and cases cited. Such was the case here on the view we take of the words in the published statement.

The second ground of demurrer advanced by the defendant is that the words used in the published statement are

not defamatory *per se.* In several counts the declaration sets forth the publication of an article in three of the defendant's daily newspapers, The Daily Kennebec Journal published in Augusta, The Waterville Morning Sentinel published in Waterville, and The Portland Press Herald published in Portland. For the purpose of determining the sufficiency of the pleading, the falsity of the article is admitted by demurrer. In each paper the article appeared on the front page and carried a headline. There were minor but relatively unimportant differences in the wording of headlines, use of subheadlines, and the use of heavy black type for emphasis, but essentially the same identical article appeared in each paper and for the purposes of examining the law applicable in this case, it will suffice to incorporate in this opinion only the article as it was published in the Portland Press Herald, as follows:

## "CROSS REPORTEDLY SOUGHT LIQUOR FAVORS FOR THREE

"Governor Burton M. Cross recently asked the two Republican members of the Liquor Commission to grant liquor listings to three persons, it was reliably learned today.

"CROSS REQUESTED the favors at a conference with Liquor Chairman Ralph A. Gallagher of Damariscotta, whom he recently named to the post and Frederick H. Bird of Rockland.

"Although the retiring governor stipulated that he did not want to cause the commissioners any 'embarrassment' in asking the favors, the directness of his approach was not in keeping with the 'hands off' practice he was careful to follow during his administration.

"Cross reportedly asked the commissioners to purchase another brand from liquor salesman Dorian McGraw of Milbridge; to purchase three brands from Foster F. Tabb, retiring Kennebec

County sheriff, apparently so that Tabb could represent a New England rum concern; and to purchase more brands from William A. Bancroft of Portland.

"BANCROFT, A FRIEND of Gardiner wine bottler Herman D. Sahagian a key figure in the 1952 liquor probe, represents a concern selling rum and gin. His gin was delisted March 1, 1950, but relisted a year ago.

"McGraw is related to ex-Senator Owen Brewster by marriage.

"Brewster's name was brought into liquor commission affairs today in another relationship—Executive Councilor Lester S. Crane of Machias said Brewster had asked him through a third party to vote for confirmation of Leo J. Cormier to the Liquor Commission.

"Cormier was confirmed last week but Crane voted against him."

At the outset, we recognize that the article must be read as a whole, taking into account its wording, the nature and use of headlines, and any other methods employed to give special emphasis in order to determine its natural and probable impact upon the minds of newspaper readers. As was said in *Brown* v. *Guy Gannett Publishing Co.*, 147 Me. 3, 5: "It is not necessary in order for printed words to be libelous that they naturally tend to expose the plaintiff to public hatred *and* contempt *and* ridicule, *and* deprive him. of the benefit of public confidence and social intercourse. *It is sufficient if they naturally tend to bring about any one of the foregoing consequences.* The governing principle of law is stated in the alternative or disjunctive, *not* in the conjunctive." We must bear in mind that "the daily newspaper is read in the haste of daily living." *Sinclair* v. *Gannett, Publisher, et al.*, 148 Me. 229, 236. An article is no less defamatory because it accomplishes its damaging mission by the use of insinuation. "Insinuations may be as defamatory as

direct assertion, and sometimes even more mischievous."
*State* v. *Norton,* 89 Me. 290, 294. In *Palmerlee* v. *Nottage,*
119 Minn. 351, 353, 138 N. W. 312, no direct charge was
made against plaintiff in a newspaper article, but by insinu-
ation all of the County Commissioners, of whom plaintiff
was one, were accused of "favoritism, nepotism and malfeas-
ance in office." The court said: "A charge need not be made
directly—indeed, the venom and sting of an accusation is
usually more effective when made by insinuations. The float-
ing calumny which each reader may affix to any and every
official act which has aroused suspicion may lay hold of is
capable of inflicting graver injury and injustice than a di-
rect, specific charge, which may be squarely met and re-
futed, if untrue." As was said in *Muchnick* v. *Post Pub-
lishing Co.,* 125 N. E. (2nd) (Mass.) 137, 138, "The dif-
ficulty in this case lies not in the law, which is well settled,
but in its application to the facts. * * * The test is whether,
in the circumstances, the writing discredits the plaintiff in
the minds of any considerable and respectable class of the
community."

We think that a reading of the article in question natural-
ly tends to expose the plaintiff to public contempt and ridi-
cule and to deprive him of the benefit of public confidence.
At the time this statement was published the plaintiff was
the Governor of Maine and, as such, the head of the Execu-
tive Department charged with responsibility for and au-
thority over the State Liquor Commission. The Legislature
in establishing the Commission has indicated that in all
matters having to do with the purchase, sale and control of
alcoholic liquors within this state, the best interests of the
state shall be served and that decisions shall not be based
upon favoritism or discrimination. We think the only ex-
ception to be found is in that provision which discriminates
in favor of the people of Maine by providing that "the com-
mission shall in their purchases of liquors give priority,

wherever feasible, to those made from the agricultural products of this state." R. S., 1954, Chap. 61, Sec. 8, Subsection IV. Pursuant to its policy of complete non-discrimination, however, the Legislature provided in Subsection V of the same section, "The commission at all times and with respect to all policies shall neither discriminate against nor in favor of any person, firm or corporation because of his residence or nonresidence in the state * * *." We think, moreover, that regardless of what we deem to be the announced policy of the Legislature in this respect, it would be highly improper for either the Governor or the Liquor Commission to permit either personal or political favoritism to govern the purchase of particular brands of liquors with public funds. Obviously, the best interests of the people of this state require that the choice of liquors to be purchased should rest only upon such factors as quality, competitive price and public acceptance and demand. The reader of the article in question would naturally conclude that the plaintiff in his then capacity as Governor of Maine had attempted to use the great influence of his high office and his appointive power to obtain from members of the Liquor Commission a deviation from those proper standards. The article, both directly and by artful insinuation, conveys to the reader that until the reported incident occurred the Governor had maintained a "hands off" policy and had left the Commission free to make decisions on the basis of merit, but that suddenly and as a marked deviation from his previous attitude he had made improper requests of two Commissioners with no more worthy objective than to benefit personal and political favorites of the plaintiff. The article is filled with political overtones and by insinuation suggests the reasons why the plaintiff might have selected the particular beneficiaries of his favor. The headlines do nothing to minimize the impact of the main article. In two out of three headlines the word "favors" was used and thereby emphasized. "Headlines are an important part of the publication, and

cannot be disregarded, for they often render a publication libelous on its face which without them might not necessarily be so * * *. In these headings to publications we frequently find the 'sting.' " *Landon* v. *Watkins,* 61 Minn. 137, 142, 63 N. W. 615. Courts have frequently made reference to the "sting" in the headline and the fact that many people in a hurried and busy society are headline readers. *Express Pub. Co.* v. *Lancaster,* 270 S. W. (Tex.) 229; *Pratt* v. *Pioneer Press Co.,* 30 Minn. 41, 14 N. W. 62; *Gustin* v. *Evening Press Co.,* 172 Mich. 311, 137 N. W. 674.

The defendant contends that although the article might properly be considered as defamatory *per se* in charging that the plaintiff requested these "favors," it is saved by the inclusion of the reference to the fact that "the retiring Governor stipulated that he did not want to cause the Commissioners any embarrassment." With this contention we cannot agree. In the first place, the emphasis of the whole article is so top heavy with respect to "favors" that the reference to "embarrassment" is completely overborne. Moreover, the reference to "embarrassment" is immediately followed in the same sentence by a reference to "favors" and the sentence itself is so constructed that it presents the two as necessarily in contrast and conflict. The writer by the very method of presentation suggests to the reader that the plaintiff's alleged reference to "embarrassment" should not be accepted or regarded as in any degree offsetting the gross impropriety of substituting favoritism for merit. Actually, the reader would be quite justified in concluding that the reference to "embarrassment" but made matters the worse. The natural and probable impression of the average reader would be that the impropriety of the requests was such as to create "embarrassment," and that the plaintiff in making suggestions which were "not in keeping" with his previous policy was himself aware that they savored of favoritism. The defendant now contends in effect that the reference to

"embarrassment" neutralizes all implication of favoritism and the only natural and probable impression of the reader would be that the plaintiff had asked for consideration of certain individuals and products on the basis of merit. We think a very different type of presentation would have been required to produce such an innocuous result. "It is not the ingeniously possible construction, but the plainly normal construction which determines the question of libel, or no libel, in written words which are maliciously published." *State* v. *Norton, supra,* at 294.

We are not unmindful that the Press as well as all other citizens must be secure in their right to make fair comment and offer criticism with reference to matters of public interest, but there is a great distinction between offering criticism on the one hand and making false statements of fact on the other. Mr. Justice Holmes in *Burt* v. *Advertiser Newspaper Co.,* 154 Mass. 238, 242, 28 N. E. 1, said: "But there is an important distinction to be noticed between the so called privilege of fair criticism upon matters of public interest, and the privilege existing in the case, for instance, of answers to inquiries about the character of a servant. In the latter case, a *bona fide* statement not in excess of the occasion is privileged, although it turns out to be false. In the former, what is privileged, if that is the proper term, is *criticism, not statement,* and however it might be if a person merely quoted or referred to a statement as made by others, and gave it no new sanction, if he takes upon himself in his own person to allege facts otherwise libelous, he will not be privileged if those facts are not true. * * * But what the interest of private citizens in public matters requires is freedom of discussion rather than of statement." (Emphasis supplied.) To the same effect, *O'Regan* v. *Schermerhorn,* 25 N. J. Misc. 1, 50 A. (2nd) 10, 17; *Cook* v. *East Shore Newspapers,* 327 Ill. App. 559, 64 N. E. (2nd) 751. So in the instant case, if it were in fact true that the plain-

tiff abused his high office by seeking to substitute personal and political favoritism for merit in the operation of a state controlled industry, the defendant would be secure in the right to make fair comment and to criticise such action; but when the very fact which alone would justify the criticism is false, as this demurrer admits, the result is libel. *Westropp* v. *E. W. Scripps Co.*, 148 Ohio 365, 74 N. E. (2nd) 340; *Augusta Evening News* v. *Radford*, 91 Ga. 494, 17 S. E. 612.

We think the instant case is not unlike the case of *Muchnick* v. *Post Publishing Co., supra.* In that case the plaintiff was chairman of a school committee. The defendant newspaper published an article criticising his manner and methods while presiding over sessions of the committee, with particular reference to his attitude toward the superintendent of schools. The "sting" of the libel was found in an insinuating question (page 139 of 125 N. E. 2d), as follows: "Could it be that the superintendent's refusal to nominate a certain principal for assistant superintendent has anything to do with the animosity shown to him?" The court found that the article could be read as charging the chairman with an "unworthy purpose," with being "so far false to the position of great public trust reposed in him as to abuse the powers of his office," and with having "the improper objective of forcing a certain appointment to be made by an unwilling superintendent against his own judgment." The court held that in so charging, the article, if false, was defamatory. In numerous cases articles charging favoritism as an abuse of public office have been held defamatory. *Levert* v. *Daily States Pub. Co.*, 123 La. 594, 49 So. 206; *Wofford* v. *Meeks*, 129 Ala. 349, 30 So. 625; *Palmerlee* v. *Nottage, supra.*

The defendant contends that we should follow the precedent which in his view was established in *Niehoff* v. *Congress Square Hotel Co., supra.* This case, however, appears

readily distinguishable. The statement there under consideration went no further than to charge that the plaintiff, a deputy attorney general engaged in the prosecution of a criminal case, urged one of the state's witnesses to give evidence as to certain material facts which, while aiding in the prosecution of the respondent, might also lead to the conclusion that the state's witness himself had committed a crime. The article further related that the state's witness did not think that he had committed any crime. There was, however, no charge or insinuation that the plaintiff was requesting false testimony, or that he knew or had reason to know that the witness had committed no crime if such were indeed the case, or that he persuaded the witness to give the desired testimony by means of promises, threats, duress, or any other improper means. The charge, reduced to its lowest terms, went no further than to indicate that the plaintiff had performed his duty properly on the basis of the knowledge he had. He was in no way defamed by the expressions of anger and chagrin which emanated from the state's witness when he discovered that the evidence which he gave disclosed that in fact and law he had committed a crime. The *Niehoff* case seems to us quite unlike the instant case, but very similar to the case of *Hylsky* v. *Globe Democrat Pub. Co.*, 348 Mo. 83, 152 S. W. (2nd) 119. In that case, a police officer alleged that he was libeled by the use of the word "trapping" in an article describing how he had secured a confession from a friend in a murder case. In sustaining a demurrer, the court noted that an examination of the entire article made it clear that the plaintiff throughout his investigation had merely performed his official duty in a creditable and efficient manner and without resort to any improper methods.

We find no error in the action of the justice below in overruling the demurrer.

The entry will be,

*Exceptions overruled.*