## J. Paul Michlin v. Kenneth Roberts and The Times-Argus Association, Inc.

[318 A.2d 163]

No. 12-73

Present: Barney, Smith, Keyser and Daley, JJ., and Hill, C. Supr. J.

Opinion Filed January 22, 1974

Motion for Reargument Denied April 2, 1974

*Langrock & Sperry,* Middlebury, for Plaintiff.

*Paterson, Gibson, Noble & Brownell,* Montpelier, and *Loftin & Wahl,* Jacksonville, Florida, of counsel, for Defendants.

**Barney, J.** This is a libel suit. A jury awarded the plaintiff $35,000.00 compensatory damages and $75,000.00 punitive damages. The defendants contend that their motion for summary judgment should have been granted because there was no basis for a claim of libel, a position repeated in their motions at and after trial for a directed verdict and judgment notwithstanding the verdict. Further, they say the issues submitted to the jury were improperly charged, and no evidence in support of any damages was introduced. On all of these grounds, reversal is sought here.

The controversy grew out of an incident involving a young woman brought to the Central Vermont Hospital emergency room with a serious head wound about one o'clock on the afternoon of January 13, 1972. The plaintiff, a specialist in emergency medicine, attended the patient, gave her treatment to stabilize her condition, and had her sent to the Medical Center Hospital in Burlington, where she later died as a consequence of that injury, a self-inflicted gunshot wound. During the time Dr. Michlin was carrying out his treatment, a call came in to the emergency room from the Barre Police Department, whereupon he instructed an emergency room secretary to report that he was treating a gunshot wound. Whether this report was ever made or not was never fully established.

The following morning a member of the defendant newspaper's staff heard a radio report relating to the incident and began inquiries. A check with the local and state police, sheriff's office, and the state's attorney turned up no one

with any knowledge of the incident. Operating on the assumption that there was a duty on the part of an attending physician to report treatment of a gunshot wound, attempts were made to reach the plaintiff. During the morning these attempts were unsuccessful, although the newspaper had been given Dr. Michlin's home phone number and called at about fifteen minute intervals. Noon, press time, came before the doctor was reached, and a story went into print.

Meanwhile, the newspaper people had called the state's attorney and an assistant attorney general to inquire about the duty of a doctor to report treatment of gunshot wounds. Whether the Vermont Statutes were available on the Times-Argus premises seems to be uncertain under the evidence.

The statute involved is 13 V.S.A. § 4012, and reads:

> Every physician attending or treating a case of bullet wound, gunshot wound, powder burn, or any other injury arising from or caused by the discharge of a gun, pistol, or other firearm, or whenever such case is treated in a hospital, sanitorium or other institution, the manager, superintendent, or other person in charge shall report such case at once to local law enforcement officials or the state police.

At the time the inquiries were made to various legal officers for gratuitous opinions, the defendants already knew that the patient had been treated in the emergency room of the Central Vermont Hospital. Whether this crucial fact was ever revealed to the interpreting attorneys does not appear in the testimony.

The evidence also revealed that two of the personnel of the paper assisting the defendant Roberts had some knowledge of Dr. Michlin and informed that defendant of it prior to any publication. One of them had previously taken his son to the same emergency room of the Central Vermont Hospital, on the recommendation of his family doctor, and the boy was given treatment by Dr. Michlin. It was his evidence that he was favorably impressed by the quality of the plaintiff as a physician. The other had attended a lecture given by the doctor and likewise received a favorable impression.

With matters in this state, the first of a series of newspaper articles was published on January 14, 1972. It was headlined, "Barre Shooting 'Not Reported'; Woman Critical". The arti-

cle went on to state that the Barre woman was undergoing treatment for a gunshot wound in the head which was never reported to the police by the physician who first attended her in the emergency room at the Central Vermont Hospital. The pleadings admit that the following statements appeared in the article:

6. The physician who attended her at the Berlin Hospital before her transfer to Burlington was J. Paul Michlin of Plainfield who operates the CVH emergency room with several other physicians. Dr. Michlin has signed out of the hospital for five days and there was no response to telephone calls made to his home this morning.

7. State Statutes require physicians to report "at once" any gun shot wounds which they treat.

8. Dr. Michlin also stated casually (in a phone conversation to Kenneth Roberts) that he relies on nurses on duty to make official reports and that he was not concerned that one had not been made in this instance even though failure to report such an incident is in violation of State law.

9. The shooting incident was brought to the attention of police officials by news reporters and Barre City, Barre Town Police and the Sheriff's Departments all declared that Dr. Michlin had not reported the shooting through their departments.

The State law also carries a penalty of $100.00 for any physician who fails to report a gun shot wound.

10. Late this morning, Cheney (State's Attorney) was uncertain as to whether charges would be brought against Dr. Michlin for his failure to report the gun shot wound.

The physician's whereabouts remained unknown at press time today.

11. That Dr. Michlin at one time was affiliated with Goddard College, but now works only at the CV emergency room. He has no private practice and his Plainfield telephone is unlisted.

Hospital officials were vague about background information of Dr. Michlin declaring he is "not a member of the hospital staff."

On January 15, 1972, a second article appeared, containing the following statements, which are likewise admitted:

18. At noon time yesterday, Cheney had not made contact with Dr. Michlin to ascertain why it wasn't reported, but said he plans to probe into the question.

The law requires that a treatment of a gun shot wound or a wound caused by a discharge of a weapon be "reported at once" by the physician. Failure to do so could result in the filing of the action against the physician and a maximum fine of $100.00 imposed, if convicted.

As of noon yesterday, Dr. Michlin told the Times Argus that he had not reported the incident to the authorities and was not aware of the statute.

19. Yesterday's report may have left the impression that the Berlin Hospital administration did not know of Dr. Michlin's background and qualifications before hiring him. This was not the case.

Joel Walker, CVH administrator, was completely cooperative with the Times Argus in obtaining information about the incident and Dr. Michlin.

Dr. Michlin is a member of the hospital's medical staff but not a member of the hospital staff, therefore, his records were not in the same files as those maintained on personnel employed directly by the hospital.

20. The article further provides:

"This confusion led to the unfortunate report that the hospital officials were vague as to the Plainfield physician's background."

On January 21, 1972, a final article appeared under the headline "Dr. Michlin Cleared in Gun Shot Incident", which was also conceded to be the fact:

Washington County State's attorney Kimberly B. Cheney said today a criminal prosecution of Dr. Paul P. Michlin (sic) for failure to report a gun shot wound would be completely unwarranted.

Cheney said his investigation showed that Miss Maureen Gendron, 20, of Barre, had received a self-inflicted gun shot wound in the afternoon of Jan. 13 and was taken to Central Vermont Hospital where she was treated by Dr. Michlin.

According to the State's Attorney, Dr. Michlin instructed the nurse to report the matter to the police. Almost immediately thereafter, the police called the hos-

pital, advising them of yet another emergency involving an overdose of drugs, which needed medical attention. Dr. Michlin, who was still working on Miss Gendron, gave emergency first aid instructions to the police.

Cheney stated other serious cases then came into the emergency room and the nurse, who Dr. Michlin had instructed to notify the police of the Gendron case, became very busy calling extra doctors to handle the work load and forgot to specifically notify the police of the Gendron case.

Cheney said Dr. Michlin has been extremely conscientious in the past in notifying police of all incidents and that, in view of the fact that he had not only instructed a responsible person to make the report, but was also extremely busy with caring for human life, that no further action would be taken.

The plaintiff took the position that not only were there a number of untruths in the article, particularly those statements relating Dr. Michlin to the crime of failing to report a gun shot wound, but that the article stated matters in a manner to bring discredit on the plaintiff without foundation or justification.

He complains that by coupling his alleged unknown whereabouts with his unlisted phone number the article suggested that some furtive evasion was taking place, whereas the paper was in possession of his telephone number and in fact talked with him before the article went to press. The statement that he has no private practice was false, and made in the face of his treatment of the son of one of the reporters on this article.

It is the position of the plaintiff that the second article repeated the false assertion that he had been guilty of some wrong doing, and attempted to justify its false report that he was not a regular member of the hospital's medical staff by implying some special or different treatment of his records, as compared to others on the medical staff, which was not true.

As to the last article, the plaintiff claims it leaves the impression that although he had not acted properly, there would be no prosecution due to mitigating circumstances. This leaves a completely false impression since, he points

out, he had done nothing illegal or improper to begin with. This unwillingness to correct the erroneous statements and impressions, even after the true facts were fully available, supports his claim, says the plaintiff, that the statements were knowingly falsely made, and done with malicious intent. His claim of damages was for the harm to his professional reputation, his embarrassment and mental strain.

■■ The motion for summary judgment, along with the motions for directed verdict and the motion for judgment notwithstanding verdict, raise the issues as to whether the pleadings, or the pleadings plus evidence, support the submission of the matter to the jury. The lower court ruled that they did, and we find the rulings supported by the record.

The evidence came in without serious controversy, with the preliminary facts leading up to publication not challenged. The plaintiff did, through cross-examination, endeavor to establish that the difficulties in reaching Dr. Michlin and the unsatisfactory phone call, coupled with the impingement of a publishing deadline, brought about some frustrations in the Times-Argus staff that led them to treat the plaintiff vindictively in the stories. But all this was for the jury on the issue of malice.

The critical legal issues related to this case culminate in the charge to the jury. Although the state of constitutional law as to libel of private individuals is in some confusion, this Court must attempt to apply it. See Annot., "Defamation —Constitutional Aspects", 28 L.Ed.2d 885 (1972).

The defendant's claim of error in the charge centers on the trial court's allocation of the burden of proof to the defendants of the issue relating to "public interest". This is a concept that evolved from the notion of a "public figure" as more subject to unrecoverable libel.

■ The law of libel, at least as it relates to First Amendment protections available to the newspaper publishing business, has undergone substantial redefinition in a series of cases before the United States Supreme Court, beginning with *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412 (1964). The cases have dealt with the limitations upon state libel laws imposed by the constitutional guarantees of freedom of speech and of

the press. *Rosenbloom* v. *Metromedia*, 403 U.S. 29, 30, 29 L.Ed.2d 296, 304, 91 S.Ct. 1811 (1971). See also Annot., *supra*, 28 L.Ed.2d 885. Analysis of the prevailing doctrine has been complicated by shifts in decisional emphasis and by a number of plurality opinions. It is clear, however, that this Court must measure the availability of a remedy for libel first against the prevailing constitutional standards set out by the United States Supreme Court.

Along with many other states, this jurisdiction has recognized in newspapers a qualified privilege, usually relating to the publication of judicial proceedings. *Lancour* v. *Herald & Globe Ass'n*, 111 Vt. 371, 383, 17 A.2d 253 (1941). Along with this goes a privilege of "fair comment", so-called, allowing critical discussion of matters of legitimate public interest or concern made without malice. *Kinsley* v. *Herald & Globe Ass'n*, 113 Vt. 272, 277, 34 A.2d 99 (1943). It is from these privileges, coupled with First Amendment considerations, that the rule of *New York Times* v. *Sullivan, supra,* 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412 (1964), was derived. That case characterized a rule protective of the media when dealing with a "public official". Recovery in favor of such a person required that he prove that the defamatory statement was made with actual malice, defined as such a statement made with knowledge that it was false, or with reckless disregard as to whether or not it was false. The limitation of the extended privilege to statements relating to official conduct was enlarged to include any matters relating to a candidate's fitness for office in cases relating to elected officials or aspirants to elective office. *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265, 28 L.Ed.2d 35, 91 S.Ct. 621 (1971); *Ocala Star-Banner* v. *Damron*, 401 U.S. 295, 28 L.Ed. 2d 57, 91 S.Ct. 628 (1971).

Meanwhile, in *St. Amant* v. *Thompson*, 390 U.S. 727, 731, 20 L.Ed.2d 262, 267, 88 S.Ct. 1323 (1968), the test of reasonable prudence as to publishing was rejected in favor of a requirement that the evidence show that the defendant entertained serious doubt as to the truth of his statements. This test is there said to amount to a showing of publication with reckless disregard for truth or falsity demonstrating actual malice. See also *Garrison* v. *Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). The ambit of the privilege was altered

by *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Building on *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 18 L.Ed.2d 1094, 87 S.Ct. 1975 (1967); and *Time, Inc.* v. *Hill*, 385 U.S. 374, 17 L.Ed.2d 456, 87 S.Ct. 534 (1967), the plurality opinion shifted the focus from the public person to the public interest. The nature of the event involved has now become a key to the existence of special privilege and constitutional protection.

There is involved in this shift an unresolved conflict, present in this case. Can the media, by falsely reporting an event, sustain itself by the claim that such an event, if true, is a matter of public interest? Does the fact that criminal activity most probably falls within the area of public interest give an enlarged privilege to a false report of crime? Certainly it would seem to be a basic requirement that the plaintiff's activities have some public interest aspect before the publication of them, if self-generated privilege is to be avoided. Constitutionally, this question is yet to be resolved. But see W. Prosser, Torts 877 (4th ed. 1971).

It is clear that the foregoing cases have indicated that it is necessary that the presence of a public interest issue be determined, as a matter of constitutional requirement. *Rosenbloom* v. *Metromedia, supra*, 403 U.S. 29, 44, 29 L.Ed.2d 296, 312, 91 S.Ct. 1811. The consequence of that determination, if public interest is found present, requires that recovery be sustained by proof that is clear and convincing "that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." *Rosenbloom* v. *Metromedia, supra*, 403 U.S. 29, 52, 29 L.Ed.2d 296, 316, 91 S.Ct. 1811. The significance of this is that there can no longer be, in connection with the publication by the media of libels associated with public interest matters, "libels *per se*" in the sense of *Towle* v. *St. Albans Pub. Co.*, 122 Vt. 134, 165 A.2d 363 (1960). Furthermore, so-called general damages cannot, in such cases, be recovered in the absence of a showing of the malice just defined, contrary to *Lancour* v. *Herald & Globe Ass'n*, 112 Vt. 471, 480, 28 A.2d 396 (1942).

█ The jury in this case was allowed to pass upon the issue of public interest; it was charged that recovery could

be had on the basis of "libel *per se*", and, further that general damages could be recovered on the basis of a presumption of injury from such false statements, libelous *per se*. In view of the prevailing constitutional requirements and the unchallenged facts in this case, these instructions were erroneous, and we must examine the consequences of these incorrect charges.

The defendants argue that these errors and the present state of the law of libel go beyond requiring a new trial and compel complete exoneration. This Court does not agree.

The key to the problem relates to the concept of libel *per se* which the charge left the jury free to apply. The application of this doctrine is inconsistent with the requirements related to a public interest issue. In this case, we must have in mind the initial facts generating the news item, *i.e.* the hospitalization and treatment of a girl with a gunshot wound. In order to give First Amendment considerations full sweep in a case of this kind, we must say that these facts relate so closely to a matter of legitimate public interest from the point of view of a free press, that the trial court should properly have decided this issue in favor of the defendant as a matter of law. See *Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29, 45, 29 L.Ed.2d 296, 312, 91 S.Ct. 1811.

This error would not have compelled reversal, however, had it not been for the libel *per se* charge that raised the possibility of the presumption of malice. This imputed malice was in no way differentiated from the malice that required the support of clear and convincing proof that the falsehood was false or published with reckless disregard as to whether it was false or not. Absent that possibility of presumed malice, a jury determination in favor of punitive damages would have established that the evidence passed the essential test to support an award in favor of the plaintiff and probably would have avoided a reversal. This conclusion is fully supported by *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130, 156–57, 18 L.Ed.2d 1094, 1111–12, 87 S.Ct. 1975.

It may be well to point out that the availability of both general and punitive damages in libel actions has not been rejected as a matter of constitutional law. The right of such recompense is recognized in *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130, 160–61, 18 L.Ed.2d 1094, 1114, 87 S.Ct.

1975, and reaffirmed in *Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29, 52, 29 L.Ed.2d 296, 317, 91 S.Ct. 1811. In the latter case, Mr. Justice Brennan, giving the opinion of the Supreme Court, specifically rejects any limitation of recovery to actual damages. We must take that to remain the law.

This view is reinforced by the denial of *certiorari* in the case of *Goldwater* v. *Ginzburg,* 414 F.2d 324 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 24 L.Ed.2d 695, 90 S.Ct. 701, *rehearing denied,* 397 U.S. 978, 25 L.Ed.2d 274, 90 S.Ct. 1085. In that case, Judge Waterman, speaking for the Second Circuit, affirmed a libel judgment in favor of the plaintiff, Barry Goldwater, based on a verdict of one dollar compensatory damages, together with punitive damages totaling $75,000. Having in mind that such verdicts are subject to correction by *remittitur,* if unjustifiable, or by reversal, if demonstrably based on passion or prejudice, *Lancour* v. *Herald & Globe Ass'n, supra,* 112 Vt. at 483, the change in the law as it relates to publication by the media affords protection to First Amendment rights by its insistence on the higher burden of proof on the issue of malice. Whenever the proof achieves this standard as to a defamatory statement, the injured party is then entitled to damages therefor accordingly as the jury finds a basis for their recovery under present law. State law in this particular has not been ousted. *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130, 160–61, 18 L.Ed.2d 1094, 1114, 87 S.Ct. 1975; *Goldwater* v. *Ginzburg, supra,* 414 F.2d at 340–41. The elements of such damage, general and punitive, are now set out in *Lancour* v. *Herald & Globe Ass'n, supra,* 112 Vt. at 475–80, subject only to the amending effect of the constitutional doctrine that makes knowing or reckless falsity a prerequisite to any damages in this kind of case, leaving the function of punitive damages to serve their "legitimate purpose in the protection of individual reputation." *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at 161.

*Reversed and remanded for a new trial.*