**Linda Burns v. The Times Argus Association, Inc.**

[430 A.2d 773]

No. 426-79

Present: Barney, C.J., Larrow, Billings and Hill, JJ., and Smith, J. (Ret.), Specially Assigned

Opinion Filed March 19, 1981

*Brian J. Grearson* of *Richard E. Davis Associates, Inc.,* for Plaintiff.

*Paterson, Gibson & Noble,* Montpelier, for Defendant.

Hill, J. In response to an anonymous tip, the defendant, Times Argus, assigned a reporter to investigate the personal use of state gasoline credit cards by plaintiff, Linda Burns. Plaintiff's husband, Brian Burns, was lieutenant governor and candidate for the Democratic nomination for governor at the time. The afternoon after receiving the tip, the newspaper printed a news article authored by its political correspondent, Nicola Marro, describing the anonymous accusations, reporting that the State Finance Commissioner, Joel Schlanger, was investigating the matter, and stating that the plaintiff and her husband were out of town and could not be reached for comment. The article's lead paragraph, reflecting the overall tenor of the story, stated that a campaign possibly was being waged to discredit the plaintiff's husband in his election bid. The story did not allege that Linda Burns used the credit cards improperly, but merely reported the existence of the anonymous tips.

Marro stated in depositions and affidavits that, before writing the article, he attempted to reach plaintiff's husband and other candidates for the Democratic nomination for governor. He also discussed the matter with the finance commissioner. There is some disagreement over the context of Marro's conversation with Schlanger, but it is not disputed that the commissioner was also investigating the matter and had in his possession at least two credit card slips signed by the plaintiff charging gasoline purchases to the state.

Brian Burns stated in depositions that when his wife, or some other person, signed for a state credit card purchase of gasoline, which he admitted occurred occasionally, it was done because he was busy at the time but that the gasoline was always used for official business.

Vermont law, as interpreted by the finance commissioner, precludes anyone other than a state official from signing for state credit card purchases.

The day following the article's publication, Brian Burns held a press conference to deny any insinuations of personal gain. He said he was there on behalf of his wife.

Linda Burns brought suit three weeks later charging the newspaper with defamation and requesting $500,000 in dam-

ages. Based on pleadings, depositions and affidavits establishing the foregoing facts, the trial judge granted defendant's motion for summary judgment. Plaintiff appeals. We affirm.

■ We must measure the availability of a remedy for libel against the prevailing constitutional standards elucidated by the United States Supreme Court. *Michlin* v. *Roberts,* 132 Vt. 154, 161, 318 A.2d 163, 167 (1974). *New York Times Co.* v. *Sullivan,* 376 U.S. 254 (1964), and its progeny emphasize a need to assure an uninhibited, vigorous press and robust, wide-open debate. *Id.* at 270. We must, however, temper our concerns for a free press with an awareness of the legitimate interest in redressing wrongful injury. While a "breathing space" is allowed to the press to assure the fruitful exercise of the freedoms of speech and comment by not demanding absolute truth, *NAACP* v. *Button,* 371 U.S. 415, 433 (1963), the Court still has allowed recovery for damage to reputation in certain circumstances. See *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 342–44 (1974).

■ In *New York Times, supra,* the Court ruled that the First and Fourteenth Amendments to the United States Constitution allow public officials to recover damages arising out of defamation upon proof that the publishing defendant was guilty of "actual malice." *Id.* at 279–80. The standard is satisfied upon proof that an alleged libelous statement is made with knowledge of its falsity or with reckless disregard of whether it is true or false. *Id.* at 280. Recklessness means a high degree of awareness of probable falsity or severe doubts as to its truth. *St. Amant* v. *Thompson,* 390 U.S. 727, 731 (1968).

The Court extended the *New York Times* standard to defamatory criticism of "public figures," *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130 (1967); *Associated Press* v. *Walker,* 388 U.S. 130 (1967), and then clarified in *Gertz, supra,* who could be considered a public figure:

> That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is

drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public figures.

418 U.S. at 351.

■ The defendant claimed, and the court below agreed, that the plaintiff is a public figure in the latter sense—as an individual voluntarily involved in a particular public issue. The question of whether a plaintiff is a public figure or public official is a constitutional issue to be decided by the trial judge upon motions for summary judgment or directed verdict. *Time, Inc.* v. *McLaney*, 406 F.2d 565, 566 (5th Cir. 1969).

■ Linda Burns' activities during her husband's career in the public sector brought her into the public eye. At the time the allegedly defamatory article was published, Brian Burns was lieutenant governor and engaged in a campaign for governor. The plaintiff had been an active campaigner during the race for lieutenant governor. She took leaflets and posters on the campaign trail for her husband. She spoke publicly for her husband in his absence and attended political gatherings alone when her husband was unavailable. Her campaigning apparently was the subject of some press coverage. She attended a public reception given by the governor after her husband's successful campaign and attended state and Democratic Party functions. She represented the lieutenant governor's office as a judge at a beauty contest. During the gubernatorial campaign, the plaintiff again was active. In addition to attending public functions, she campaigned for him, passing out leaflets and posters on his behalf.

Plaintiff's activities were aimed at affecting the outcome of a public issue—the political campaign. Her appearances obviously were geared towards influencing other people, her activities were conspicuous and her campaign involvement, however limited, involved a voluntary commitment to participate in an open and public activity. Courts have included within the definition of a public figure for limited purposes a football coach, *Curtis Publishing Co., supra;* political activist, *Associated Press, supra;* wife of a nationally known television celebrity, *Carson* v. *Allied News Co.*, 529 F.2d 206 (7th Cir. 1976);

children of convicted spies, *Meeropol* v. *Nizer*, 560 F.2d 1061 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013 (1978); president of a taxicab company, *Fram* v. *Yellow Cab Co.*, 380 F. Supp. 1314 (W.D. Pa. 1974); belly dancer, *James* v. *Gannett Co.*, 40 N.Y.2d 415, 353 N.E.2d 834, 386 N.Y.S.2d 871 (1976); and editor of a newspaper, *Tait* v. *King Broadcasting Co.*, 1 Wash. App. 250, 460 P.2d 307 (1969). Plaintiff's activities fall within the *Gertz* category as defined by those cases. Plaintiff's position in the public eye, closely linked to her husband's political career, thus made her a public figure for activities involving that position.

The Court in *Gertz, supra,* in expanding the *New York Times* standard to public figures, noted that people fitting that category usually enjoy significantly greater access to channels of effective communication than private individuals. 418 U.S. at 344. Reasoning that access to the media made public figures less vulnerable to attack, the Court was able to expand protections to the press without damaging a person's ability to protect his reputation. In the case at bar, the plaintiff's husband held a press conference the day following publication of the article. Noting that he was speaking on behalf of his wife, the lieutenant governor denied the anonymous accusations reported in the article. The defendant Times Argus covered the press conference and included the denials in an article the next day. A subsequent article reported that the finance commissioner had uncovered no wrongdoing. The scenario reflects the very "uninhibited debate" which lies at the core of the *New York Times* standards.

Three cases cited in plaintiff's brief to support the claim that she is not a public figure merit comment. *Time, Inc.* v. *Firestone,* 424 U.S. 448 (1976), found that a prominent socialite in Florida did not become a public figure for purposes of her highly publicized divorce despite holding press conferences. In *Firestone,* however, the plaintiff did not thrust herself voluntarily into the public eye in an effort to affect the outcome of an issue. The Court, in fact, noted that those people involved in litigation, which becomes the subject of press attention, are "drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others." *Id.* at 457. Unlike a litigant whose

recourse is the courtroom, and who gains public attention because of the litigation, Mrs. Burns actively campaigned for her husband and, in effect, attested to his character and his ability to govern in an effort to affect the outcome of the election. The Times Argus article, as noted above, emphasized an aspect of that campaign—it was written from the standpoint of reporting possible efforts to discredit Mr. Burns—and involved a matter of central importance to the gubernatorial race.

*Hutchinson* v. *Proxmire,* 443 U.S. 111 (1979), involved a scientist engaged in federally funded animal research. The Court ruled that mere success in attaining federal funds does not transform someone to the status of public figure. Unlike Mrs. Burns, Hutchinson did not thrust himself or his views into public controversy or attempt to influence others. The Court noted that before the alleged defamation the plaintiff had been without public attention, that any public attention was the result of the alleged defamation, and that Hutchinson was without ready access to the press. *Id.* at 135–36. The contrast to Linda Burns is obvious.

Finally, plaintiff seeks support from *Wolston* v. *Readers Digest Association, Inc.,* 443 U.S. 157 (1979). In that case, the plaintiff "led a thoroughly private existence prior to the grand jury inquiry [which brought about press coverage] and returned to a position of relative obscurity after his sentencing" for failure to obey a subpoena. *Id.* at 165. The alleged defamation was written fifteen years later. Consistent with *Firestone, supra,* since Wolston was forcibly involved with litigation and as a result received public attention, the case does not help Linda Burns' claim. Linda Burns was not drawn into the public eye due to judicial action, participated in more than one newsworthy event, was involved in public issues at the time of the article, and did not seek obscurity after an event with only remote public character which received attention fifteen years later.

The newspaper article involved the use of state gasoline credit cards. We are without evidence disputing the claim that the plaintiff in fact used the cards. Mr. Burns' own testimony contained an admission that she used them. There can be no argument that the use of state funds is a matter of

public interest. While the Court has hedged on its *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29 (1971), holding that the *New York Times* protection should extend to defamatory falsehoods relating to private persons if the statements concern matters of general or public interest, see *Gertz, supra,* it can not be concluded that the subject of the newspaper article is irrelevant. The plaintiff had voluntarily involved herself in the campaign, publicly endorsing her husband and working for his election. The charges reported by the defendant touched upon both Brian Burns' qualifications for governor and Linda Burns' qualifications for adorning him with public endorsements. The scope of the article thus encompassed the area, however narrow, within which the plaintiff must be considered to be a public figure.

Vermont law lends support to finding Linda Burns to be a public figure. In *Michlin, supra,* the Court endorsed the privilege of "fair comment"—and concomitant adoption of the *New York Times* standard—to statements relating to a political candidate's fitness for office. 132 Vt. at 161, 318 A.2d at 167–68. See also *Colombo* v. *Times-Argus Assoc.,* 135 Vt. 454, 380 A.2d 80 (1977). *Michlin* cited *Ocala Star-Banner Co.* v. *Damron,* 401 U.S. 295 (1971), wherein the United States Supreme Court wrote:

> Public discussion about the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule.

401 U.S. at 300–01.

██ For a public figure to recover in a defamation suit, actual malice must be proved with clear and convincing clarity —not merely by a preponderance of the evidence. *New York Times, supra,* 376 U.S. at 285–86; *Gertz, supra,* 418 U.S. at 342. Much as the Court has stated that the question of who is a public figure or public official is to be decided upon motion for summary judgment or directed verdict, *id.,* the sufficiency of evidence of actual malice may be decided by the trial judge on motions. As stated in *Time, Inc.* v. *McLaney, supra:*

> The subject matter of this litigation, involving, as it does, the very serious and timely question of how far the First Amendment guarantee of freedom of the press may still

be impinged upon by actions for libel, places some cases in a somewhat different category. This follows when the trial court and this court jointly consider that the failure to dismiss a libel suit might necessitate long and expensive trial proceedings, which, if not really warranted, would themselves offend the principles enunciated in Dombrowski v. Pfister, 380 U.S. 479 . . . because of the chilling effect of such litigation.

406 F.2d at 566.

 To find actual malice, there must be sufficient evidence that the alleged libelous statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson, supra,* 390 U.S. at 731. Negligence alone is constitutionally insufficient. *New York Times, supra,* 376 U.S. at 279–80. Malice may not be presumed or inferred from the nature of the defamatory statement. *Greenbelt Cooperative Publishing Association* v. *Bresler,* 398 U.S. 6, 13–14 (1970). Malice may not be found merely by showing failure to investigate adequately before publication, *Curtis, supra,* 388 U.S. at 153, failing to verify the facts, *Hurley* v. *Northwest Publications, Inc.,* 273 F. Supp. 967, 974 (D. Minn. 1967), or misrepresenting the facts because of a misconception, *Time, Inc.* v. *Pape,* 401 U.S. 279, 290 (1971). There is nothing in the record to support a claim of actual malice. In fact, there is nothing to support even a trace of negligence. The article's lead paragraph that a campaign perhaps was underway to discredit Brian Burns was accurate; the finance commissioner was investigating the charges. Quoting from an anonymous letter, although perhaps lacking in responsibility, did not constitute an actionable offense. While an anonymous accuser may be less legitimate than the detractor-defendant in *Edwards* v. *National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir. 1977), the philosophy underlying *Edwards* is significant:

What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation.

*Id.* at 120.

*Judgment affirmed.*