## FOODSCIENCE CORPORATION
### v.
### McGRAW–HILL, INC.
### Civ. A. No. 80–186.

United States District Court,
D. Vermont.

July 10, 1984.

Peter F. Langrock, and Ellen Mercer Fallon, Langrock, Sperry, Parker & Wool, Middlebury, Vt., for plaintiff.

Austin B. Noble, Gibson, Noble & Goodrich, Montpelier, Vt., for defendant; Robert W. Meserve, Michael J. Liston, Palmer & Dodge, Boston, Mass., of counsel.

## MEMORANDUM OF DECISION

HOLDEN, Senior District Judge.

The plaintiff FoodScience Corporation (FoodScience) has invoked the court's diversity jurisdiction to recover for commercial defamation, alleging wrongdoing by the defendant McGraw-Hill, Inc., in its publication of two related writings in *Medical World News* of January 21, 1980. The defendant has responded by way of a motion for summary judgment. The defendant has advanced numerous reasons in support of its contention that the plaintiff's recovery for defamation is precluded as a matter of law. The most salient and persuasive of the points urged by McGraw-Hill, Inc., are that FoodScience is a public figure and in this posture the complainant has failed to demonstrate actual malice, essential to compensatory or punitive awards in defamation proceedings.

### Underlying Facts

The court's conspectus of the record is undertaken with deference to the favorable posture the plaintiff assumes as the opponent to the motion for summary denial of its claims. *E.g., United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Thus viewed, these facts appear.

The roots of the present controversy are implanted in the so-called Laetrile movement. Guido Orlandi founded FoodScience in 1973. Mr. Orlandi remained an active force in the corporation until his decease. He and his son Dom Orlandi have served as the plaintiff's chief executive officers. Members of the Orlandi family are the sole owners of the plaintiff and its corporate predecessor International FoodScience Corp. Both corporations bearing the FoodScience name were organized to market health food products labeled "Anangamik-15" and "Gluconic-15." The complaint states these products are popularly referred to as "B-15." International Food-

Science marketed a product labeled B–17, which is referred to by the name Laetrile.

According to his deposition testimony, Guido Orlandi has been deeply involved with Laetrile after purchasing stock in a Canadian company, Biozymes International. This company was founded by Andrew McNaughton. Orlandi later met McNaughton, who induced him to invest almost a million dollars in the companies organized to market and promote sales of Laetrile throughout the world, but initially in Beirut and Mexico. Guido Orlandi's prime interest in Biozymes was its ownership of the so-called Laetrile formula. This fact interested other investors, including Joe Zicarelli from New Jersey, who was represented on the Biozymes board of directors by an attorney named Gallagher.

Early in Orlandi's involvement with corporate promotion of Laetrile, he learned from McNaughton's associate, who sold him the stock in Biozymes, that the "fellow down in New Jersey," Zicarelli, was helping to make "the thing go." Orlandi referred to Zicarelli in his deposition testimony as "one of the boys in the racket." Orlandi further testified he later learned that Zicarelli was involved in organized crime and had recently been convicted of tax evasion. Orlandi also learned, some two or three years after he had invested in the Laetrile enterprise, that other people who invested in Biozymes had ties with organized crime. He explained: "We needed money so desperate it was for a good cause, so I just shut my eyes and kept going." [Sic].

Mr. Guido Orlandi further stated that he had never met Zicarelli. McNaughton told him that he, McNaughton, arranged to have Dr. Krebs give Mr. Zicarelli's sister his purported anti-cancer product. Orlandi also testified that his wife Maria had experienced four or five operations as a result of non-malignant tumors. She was helped by Laetrile, which contained and retarded the growth of her tumors. Orlandi explained this in his deposition testimony.

In the late 1960's the Securities and Exchange Commission undertook an investigation of Biozymes concerning alleged illegal stock sales. Orlandi was deposed on September 2, 1971. He resigned from the Biozymes Board of Directors when he, along with Zicarelli, McNaughton and others were charged by the SEC with violating the securities laws. *S.E.C. v. Biozymes International, Ltd.*, No. SW–7112–C (N.D. Cal. Dec. 4, 1979). Both Zicarelli and Orlandi entered consent judgments in the case and were restrained from making further sales of Biozymes stock or from making illegal sales of any other stock.

At about this time in 1972, Orlandi organized the International FoodScience Corporation to market B–15 and B–17. The latter is an alternative designation for Laetrile. To raise money for his fledgling corporation, Orlandi sold unregistered stock. (SEC dep. III, A III 71 at pp. 76–77). The SEC deposed Orlandi for a second time on August 28, 1973 in connection with sales of stock in his new company. As a result of this investigation, International FoodScience Corp. was dissolved and replaced by FoodScience Corporation, the plaintiff here.

Pursuant to 21 U.S.C. § 301 *et seq.*, the FDA seized and impounded in 1977 six shipments of Aangamik 15 as an adulterated food, *see* 21 U.S.C. § 342, charging the product was unsafe for public consumption. *See id.* at § 348(a). The government also contended that the B–15 tablets were misbranded as "vitamins." By this action the FDA sought to enjoin interstate shipment of plaintiff's B–15 products. *See United States v. An Article of Food*, 503 F.Supp. 925 (N.D.Ill.1980), *aff'd* 678 F.2d 735 (7th Cir.1982). The bench trial was begun in Chicago on December 12, 1979.

In response to the public attention that focused on the case, FoodScience hired a public relations firm, called Savvy Management, to distribute an extensive 150 page press kit concerning the plaintiff. This publicity material was sent to approximately 1,000 magazine and newspaper editors, TV and radio news directors and other media representatives.

*Medical World News,* a medical journal with a distribution to approximately 100,000 licensed physicians, received the press kit in December, 1979. On orders from its managing editors, the press kit was reviewed and a senior staff writer was assigned to write about B–15. Two news reports under Chicago date line were published by *Medical World News* in its January 21, 1980 issue. The lead news story carried the title *Feds Closing in on "Vitamin" B–15.* The same publication carried a sequel, referred to in the record as a "shirttail" article, under the heading *B–15, Laetrile and the Mafia.*

The first news item discusses the FDA suit against FoodScience then pending in federal district court in Chicago. This writing focuses on the controversy over B–15's therapeutic value, or lack thereof, and summarizes some of the testimony from the federal trial.

The so-called "shirttail" article relates what the author believes to be a link between the development of B–15 and the controversial cancer drug, Laetrile. It begins with a statement by a Dr. Halstead concerning favorable clinical results he achieved using B–15. Dr. Halstead is identified as the author of a book on the Laetrile movement, *Amygdalin (Laetrile) Therapy.* The next paragraph discusses the discovery in 1951 of both B–15 and Laetrile by Dr. Ernest Krebs. The article's third paragraph describes how the Krebses later developed a synthetic B–15, which was a different chemical than the B–15 the Krebs extracted from apricot pits.

The fourth paragraph introduces Andrew McNaughton and states that he took over the Krebs' patent. According to the article, McNaughton began making Laetrile in Canada. Paragraphs five and six discuss McNaughton giving Joseph Zicarelli's sister Laetrile treatments and receiving a $300,000 donation from Zicarelli. Paragraph seven consists of one sentence which states "The Mafia connection to the Krebses' compounds was traced through McNaughton's statements to MWN plus independent investigation."

Paragraph eight is the first to refer to the Orlandis. It states in full:

The 1979 paperback book, *B–15—The "Miracle Vitamin",* points to an earlier source of funds: "In the early 1960's, a wealthy Italian-American family named Orlandi sought out Ernest Krebs when the elder Mrs. Orlandi developed breast tumors.... Krebs secretly administered his B–17 therapy to Mrs. Orlandi, and within two weeks, the tumors disappeared."

Paragraph nine states that "the Orlandi family began to support McNaughton financially in 1963 and they invested millions over the next fifteen years in the company which the Canadian launched to exploit the Krebs' patents and products." Following these publications, plaintiff filed this defamation action alleging that the articles created the inference that FoodScience Corporation had Mafia connections.

## Discussion

The court's first concern is whether this controversy can be adjudicated by the summary disposition sought in the defendant's motion. In actions for defamation there is no preference to incline the court toward the grant or denial of a motion for summary judgment. *Yiamouyiannis v. Consumers Union of the United States, Inc.,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980). There is one notable variation from the usual procedure for summary disposition of First Amendment issues. The procedural deviation lies in the protected area of free expression concerning persons who are "public figures."

FoodScience, in the legal sense, stands in the posture of a public figure within the concept of the term expressed in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Court recently applied the *New York Times* rule in a products disparagement action instituted by a corporate public figure. *Bose Corp. v. Consumers Union of the United States, Inc.,* — U.S. —, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

In *Bose* the Court was confronted with the apparent conflict in the application of Rule 52(a) of the Federal Rules of Civil Procedure which prescribes the "clearly erroneous" standard for appellate review and the opposing demands in judicial consideration of First Amendment issues. The latter obligation imposes on the courts the duty " 'to make an independent examination of the whole record' to make sure 'that the judgment does not constitute intrusion on the field of free expression.' " *Id.* — U.S. at ——, 104 S.Ct. at 1958 (quoting *New York Times v. Sullivan, supra* 376 U.S. at 284–286, 84 S.Ct. at 728–729.)

Justice Stevens, the author of the Court's opinion, makes it clear that judges, confronted with the question of protected expression, "must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not clearly supported by clear and convincing proof of 'actual malice.' " —— U.S. at ——, 104 S.Ct. at 1967.

This constitutional precept was given clear expression in this circuit by Judge Oakes in appellate review of a summary judgment in another product defamatory action; *Yiamouyiannis v. Consumers Union of the United States, Inc., supra* 619 F.2d at 940. In keeping with this decision, this court entertains no doubt that FoodScience is clearly a corporate public figure.

The test for determining whether a person is a public figure was prescribed in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court stated:

> For the most part those who attain [the status of public figure] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In

either event, they invite attention and comment.

*Id.* at 345, 94 S.Ct. at 3009.

To be sure, the plaintiff is not a public official occupying an official position as the entrepreneur of Laetrile. However, it is a corporate person that has thrust itself into the public controversy that attends the preparation and distribution of this particular product.

■ FoodScience is one of the leading producers and distributors of B–15, a product which has become the focus of considerable public controversy, particularly among members of the medical community. After it became the defendant in an action brought by the FDA, FoodScience distributed a press kit containing 150 pages of material including a list of source material available upon request. This press kit was circulated to media representatives nationwide. By distributing this publicity, FoodScience was doing more than answering the charges brought against it by the FDA. It sought to influence public opinion concerning its product. The press kit, which included a history of the Orlandi family involvement in Laetrile and B–15, covered a far greater range of issues than the FDA proceedings. It is clear that FoodScience sought to urge public acceptance of its controversial product. The *Medical World News* articles drew heavily on the material provided by Savvy Management and was responsive to FoodScience's efforts to influence the controversy surrounding Laetrile and B–15. On the strength of this aspect of the record, FoodScience is a limited purpose public figure.

Certainly the Laetrile controversy has persisted and been kindled by the plaintiff's public relations representative, Savvy Management. It is beyond dispute that the objective of this firm was to influence and counter the adverse impact of the unfavorable publicity that attended the FDA investigation and subsequent litigation. The press kit circulated to the media, including *Medical World News,* not only invited favorable attention, but solicited the media to comment. By force of this solicitation, the

plaintiff became a public figure in terms of First Amendment protection. *Yiamouyiannis v. Consumers Union of the United States, Inc., supra,* 619 F.2d at 938.

The next and crucial question calls upon the court to determine whether the facts advanced by the plaintiff constitute clear and convincing proof of actual malice on the part of the defendant. Such a showing is essential "to cross the constitutional threshold that bars the entry of any judgment" against established precepts of free expression. *Bose, Inc. v. Consumers Union of the United States, supra,* —— U.S. at ——, 104 S.Ct. at 1967.

■ By force of having entered the public domain, the risk of persuasion on the issue of malice resides with the plaintiff who asserts it. In affirming the grant of summary judgment in *Yiamouyiannis, supra,* the opinion by Judge Oakes teaches:

> In a case where the defendant has moved for summary judgment on the issue of actual malice and the plaintiff claims that there remain material factual disputes, the court decides the materiality of the disputed facts by accepting the plaintiff's version and applying the actual malice standard.

619 F.2d at 940.

As in *Yiamouyiannis,* plaintiff FoodScience does not seek or suggest the need for further discovery. The time for further discovery has long since past.

Accepting its burden by reference to proof in the record, the plaintiff contends that "the *Medical World News* staff and writers published the offending material 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" (Plaintiff's Memorandum of February 3, 1984 at 23; quoting *New York Times Co. v. Sullivan, supra,* 376 U.S. at 280, 84 S.Ct. at 726.) In support, plaintiff seeks to show that editor Robert Herschberger had actual knowledge that the story "was false and would create a false impression." (Plaintiff's Memorandum at 23). Plaintiff quotes from the first paragraph reference to the Orlandis in the original draft version of the sequel article to indicate that this draft portrayed "the elder Mrs. Orlandi" as having a maiden name of Zicarelli. Plaintiff urges that because this portion of the original draft version was known to be incorrect, and the remainder of the paragraph was printed without substantial changes, then defendant acted with reckless disregard for the truth. The record does not support the contention. Accepting plaintiff's version of the facts as true, plaintiff has not shown with convincing clarity that defendant's editors acted with actual malice or disregard for the truth.

The fact that the reference to Mrs. Orlandi as a sister of Zicarelli was removed from the published version of the article indicates that defendant acted with caution, rather than with reckless disregard of the truth.

The plaintiff has left the factual statements in the *Medical World News* without serious challenge or contradiction. Indeed, many of the factual statements were derived from the press kit provided by the plaintiff's public relations firm. The assertions made concerning organized crime connections of the Laetrile enterprises are confirmed by much of Mr. Orlandi's deposition testimony.

Plaintiff also urges that inadequacy of investigation and preparation by the *Medical World News* writer constitute actual malice. The opinion of the Vermont Supreme Court in *Burns v. The Times Argus Association, Inc.,* 139 Vt. 381, 430 A.2d 773 (1981) is instructive on this point.

> Malice may not be presumed or inferred from the nature of the defamatory statement. *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 13–14 [90 S.Ct. 1537, 1541, 26 L.Ed.2d 6] (1970). Malice may not be found merely by showing failure to investigate adequately before publication, [*Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153 [87 S.Ct. 1975, 1990, 18 L.Ed.2d 1094] (1967)], failing to verify the facts, *Hurley v. Northwest Publications, Inc.,* 273 F.Supp. 967, 974 (D.Minn.1967), or misrepresenting the facts because of a mis-

conception, *Time, Inc. v. Pape*, 401 U.S. 279, 290 [91 S.Ct. 633, 639, 28 L.Ed.2d 45] (1971).

*Id.* at 389, 430 A.2d 773.

According to the law of Vermont, plaintiff's argument that actual malice is shown by the author's failure to investigate must fail. It appears that the author's initial errors were corrected by his editors prior to publication.

The court's examination of the record, taken in the light most favorable to the plaintiff, fails to establish clear and convincing evidence of actual malice. The defendant's motion for summary judgment will be granted. This conclusion makes it unnecessary to consider the remaining points advanced by the defendant in its supporting papers.

The clerk is directed to enter judgment for the defendant.

It is SO ORDERED.