## John S. Burgess v. Reformer Publishing Corporation & George Carvill

[508 A.2d 1359]

No. 84-059

Present: **Hill, Peck and Hayes, JJ., and Barney, C.J. (Ret.), and Keyser, J. (Ret.), Specially Assigned**

Opinion Filed February 28, 1986

*Edwin H. Amidon, Jr., Herbert Ogden, Jr.,* and *Amy S. Fitz-Gerald* (Of Counsel), of *Langrock Sperry Parker & Wool*, Burlington, for Plaintiff-Appellant.

*LuAnn Van Zeeland* of *Dinse, Erdmann & Clapp*, Burlington, for Defendants-Appellees.

**Hill, J.** Plaintiff-appellant, John S. Burgess, appeals an order of the superior court granting summary judgment on plaintiff's libel action in favor of defendants-appellees, Reformer Publishing Corporation and reporter George Carvill. We believe that the trial court erred in ruling, as a matter of law, that plaintiff was a "public official" at the time of the alleged libel. We also believe that the trial court erroneously concluded that the publication could not support a defamation action and therefore reverse.

In March, 1979, the *Brattleboro Reformer* printed an article concerning a grand jury investigation of an alleged embezzlement of federal funds by the former president of the then-defunct Mark Hopkins College. The headline read: *"Grand Jury Probes Embezzlement—Mark Hopkins: Burgess Denies Getting Funds."*

When this article was published plaintiff was the Town Agent for the Town of Brattleboro. He claims that he was damaged in his reputation by defendants' knowingly false and libelous innuendo that he was the subject of a grand jury investigation and guilty of criminal wrongdoing[1] and that he suffered loss of income and mental and physical injury.

Defendants moved for summary judgment pursuant to V.R.C.P. 56 alleging, inter alia, that plaintiff "was at all times material not only a public official but a public figure." In support of this assertion, defendants cited only plaintiff's answers to defendants' requests to admit which outlined plaintiff's political and professional career in Vermont, including his association with Mark Hopkins College. The trial court determined that, as Town Agent, plaintiff was a public official. It further concluded that the materials presented did not raise an issue of actual malice on the part of either defendant. Accordingly, it granted defendants' motion for summary judgment.

I

In *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 279-80 (1964), the United States Supreme Court ruled that the constitutional guarantee of free speech "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with

---

[1] Although plaintiff was subpoenaed to testify before the grand jury, he was at no time under investigation for the underlying embezzlement.

reckless disregard of whether it was false or not." This standard was subsequently extended to defamatory criticism of "public figures," *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155 (1967), and in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974), the term "public figure" was further clarified:

> That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.

Defendants concede that plaintiff was not a public official for purposes of this suit as the allegedly libelous publication did not criticize or pertain to plaintiff's official conduct as Town Agent. See *Sullivan, supra*, 376 U.S. at 283 ("Constitution delimits a State's power to award damages for libel in actions brought by *public officials against critics of their official conduct.*") (emphasis added). They contend, however, that the trial court's ruling should be affirmed because plaintiff is either an all-purpose public figure or a public figure insofar as his involvement with the grand jury's embezzlement investigation is concerned.

█ To become a public figure "for all purposes and in all contexts," a person must achieve "pervasive fame or notoriety." *Burns v. Times Argus Association, Inc.*, 139 Vt. 381, 384, 430 A.2d 773, 775 (1981) (quoting *Gertz, supra*, 418 U.S. at 351)). The test is a stringent one. "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz, supra*, 418 U.S. at 352; see also *Wolston v. Readers Digest Association, Inc.*, 443 U.S. 157, 165 (1979) (petitioner did not occupy position of pervasive power and influence such that "he could be deemed one of that small group of individuals who are public figures for all purposes"); *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980) ("a person can be a general public figure only if he is a 'celebrity'—his name a 'household word'—whose ideas and actions the public in fact follows with great interest.").

█ We recognize that nationwide fame may not be required. See *Waldbaum, supra*, 627 F.2d at 1296 n.22 (question is whether

the individual is known to a large percentage of the well-informed citizenry in the community or region where he was defamed). Nevertheless, we do not believe that the defendants here sustained their burden of demonstrating that plaintiff had achieved the necessary degree of notoriety to be considered an all-purpose public figure. The only evidence proffered on this issue was plaintiff's responses to defendants' requests to admit. Although plaintiff admitted to holding certain political and professional positions that arguably exposed him to public scrutiny, those admissions in and of themselves do not establish fame and notoriety. A question of material fact was left unresolved—namely, whether plaintiff was a household name in the community. Consequently, although defendants may ultimately prevail on this issue, the trial judge's decision to grant them summary judgment cannot be upheld on the record here. See V.R.C.P. 56(c) (judgment shall be rendered on motion only if there is no genuine issue as to any material fact and party is entitled to judgment as a matter of law).

Defendants contend that even if plaintiff is not an all-purpose public figure, he is a public figure insofar as his involvement with Mark Hopkins College, his appearance before the grand jury, and his discussions with the press are concerned.

Persons who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" clearly become public figures for a limited range of issues surrounding such controversy. *Gertz, supra,* 418 U.S. at 345. This analysis requires courts to make a two-step inquiry: first, they must isolate what is alleged to be the public controversy.[2] *Waldbaum, supra,* 627 F.2d at 1296. Second, courts must focus on the " 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' " *Id.* (quoting *Gertz, supra,* 418 U.S. at 352).

Defendants assert that a person must simply be "drawn into . . . a public controversy" to become a public figure insofar as that controversy is concerned. See *Gertz, supra,* 418 U.S. at 351. We cannot agree. Courts have consistently emphasized that persons must " 'thrust themselves to the forefront' " of a public

---

[2] Courts should be somewhat cautious in defining the contours of public controversies; however, "[i]f the issue [is] being debated publicly and if it [has] foreseeable and substantial ramifications for nonparticipants, it [is] a public controversy." *Waldbaum, supra,* 627 F.2d at 1297.

controversy or assume a place of " 'special prominence' " in the resolution of public questions to be held to have relinquished their interest in the protection of their own name. See *Waldbaum, supra,* 627 F.2d at 1297 (quoting *Gertz, supra,* 418 U.S. at 345, 351).[3]

In *Burns, supra,* 139 Vt. at 386, 430 A.2d at 775, for instance, the plaintiff openly and voluntarily participated in her husband's political campaign for the Democratic nomination for governor and thereby became a public figure for her activities in that regard. On the other hand, in *Time, Inc.* v. *Firestone,* 424 U.S. 448, 455 (1976), the United States Supreme Court held that, despite holding press conferences on the matter, the wife of one of America's wealthier industrialists did not become a public figure for purpose of her highly publicized divorce. The Court reasoned that the majority of litigants are

> drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others. There appears little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom.

*Id.* at 457.

In *Wolston, supra,* 443 U.S. at 166, this reasoning was found to be equally persuasive where a potential defamation plaintiff failed to respond to a grand jury subpoena and was subsequently cited for contempt. Although these incidents attracted a considerable amount of media attention, the Court emphasized that the plaintiff did not voluntarily thrust or inject himself into the controversy at hand; he did not discuss the matter with the press and he "limited his involvement to that necessary to defend himself against the contempt charge." *Id.* at 166-67.

---

[3] In *Wolston, supra,* 443 U.S. at 164, the Supreme Court noted that the rationale for extending the *New York Times* standard to public figures was two-fold. First, public figures are recognized as being less vulnerable to injury from defamatory statements because they generally enjoy significantly greater access to effective channels of communication than do private persons. Second, and more importantly for purposes of this appeal, by thrusting themselves to the forefront of public controversies they voluntarily expose themselves to increased risk of harm, and therefore are less deserving of protection than private individuals.

618

■ The parallels are obvious. The plaintiff in this case was subpoenaed to appear before a grand jury investigating an alleged embezzlement of federal funds by the president of Mark Hopkins College. As trustee and treasurer of the College, he was dragged unwillingly into the controversy.

Defendants claim that plaintiff approached and discussed the federal investigation with the press and that he used the press to assert his denial of any involvement in the embezzlement investigation. Plaintiff answers that defendant Carvill initiated the encounter and that he simply responded to his questions.[4] As an issue of material fact remained in dispute, summary judgment should not have been granted.

## II

We still must ask whether the publication at issue is not defamatory as a matter of law for if we answer this question in the affirmative the trial court's summary ruling must be upheld.

■ Defendants contend that in examining this issue the article must be read as a whole, see *Lancour v. Herald & Globe Association*, 111 Vt. 371, 379, 17 A.2d 253, 256 (1941) ("meaning of an alleged libel is to be gathered from the whole publication"), and that the news printed in the underlying article cured any potentially actionable language in the headline itself. Plaintiff, on the other hand, urges us to adopt the "fair index" rule fashioned by the New York Court of Appeals in *Campbell v. New York Evening Post, Inc.*, 245 N.Y. 320, 328, 157 N.E. 153, 156 (1927). Under the fair index rule:

> If the headline is a fair index of an accurate article, it is not actionable. If it is not a fair index [—does not fairly indicate the substance of the matter to which it refers—] then the headline must be examined independently to determine whether it is actionable under general principles of libel.

*Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 287, 426 N.Y.S.2d 274, 283 (1980).

---

[4] Responding to press inquiries does not necessarily mean that a person becomes a public figure with respect to the subject matter discussed. See *Waldbaum, supra*, 627 F.2d at 1298 n.31. A person must attempt to use the press to shape the outcome of, or increase his or her influence in, a specific public controversy to lose the protections afforded private individuals. *Id.* at 1298 n.32; see also *Firestone, supra*, 424 U.S. at 454-55 n.3.

We deal here with the most fundamental element of a private libel action: the statement published must be false and defamatory. See *Lent* v. *Huntoon*, 143 Vt. 539, 546, 470 A.2d 1162, 1168 (1983). In determining whether a party has met its burden in this regard an article must be reviewed for what it is read to say, "taken in its plain and natural meaning," by persons reading it. See *Lancour, supra*, 111 Vt. at 379, 17 A.2d at 256.

In essence, we are asked to harmonize, inasmuch as possible, the guarantee of a free press and the individual's interest in protecting his reputation. In striking this balance, we cannot ignore the fact that "many people in a hurried and busy society are headline readers." *Cross* v. *Guy Gannett Publishing Co.*, 151 Me. 491, 496-97, 121 A.2d 355, 358 (1956). Although "the defamatory meaning of the headline may be dispelled by a reading of the entire article . . . , [a] headline is often all that is read by the casual reader and therefore separately carries a potential for injury as great as any other false publication." *Schermerhorn, supra*, 73 A.D.2d at 287, 426 N.Y.S.2d at 283. As the court in *Black* v. *Nashville Banner Publishing Co.*, 24 Tenn. App. 137, 144, 141 S.W.2d 908, 912 (1939) (citations omitted), rightly pointed out:

> "The headline of an article or paragraph, being so conspicuous as to attract the attention of persons who look casually over a paper without carefully reading all its contents, may in itself inflict very serious injury upon a person, both because it may be the only part of the article which is read, and because it may cast a graver imputation than all the other words following it. There is no doubt that in publications . . . claimed to be libelous, the headlines directing attention to the publication may be considered as a part of it, and may even justify a court or jury in regarding the publication as libelous when the body of the article is not necessarily so."

See also *Reardon* v. *News-Journal Co.*, 53 Del. 29, 32, 164 A.2d 263, 265 (1960) ("the sting of a libel may sometimes be contained in a word or sentence used in a headline to the body of the article, even though the facts are correctly set forth in the body."); *Landon* v. *Watkins*, 61 Minn. 137, 142, 63 N.W. 615, 617 (1895) ("headlines are an important part of the publication, and cannot be disregarded, for they often render a publication libelous on its face which without them might not necessarily be so.").

■ We recognize that a "majority of jurisdictions support the rule that headlines are generally to be construed in conjunction with their accompanying articles." *Fernandes* v. *Tenbruggencate*, 65 Hawaii 226, 230 & n.3, 649 P.2d 1144, 1148 & n.3 (1982). Nevertheless, we cannot subscribe to the theory that a "newspaper is entitled to a summary judgment where it prints a nonlibelous [article] under a libelous headline." See *Stones River Motors, Inc.* v. *Mid-South Publishing Co.*, 651 S.W.2d 713, 724 (Tenn. Ct. App. 1983) (Todd, J., concurring). Accordingly, we hold that a defamatory headline is actionable even if the matter following is not, unless the headline is a fair index of the accurate article with which it appears. Of course, in determining whether a headline fairly indicates the substance of the matter to which it refers, the headline and article must be considered together. See *Schermerhorn*, *supra*, 73 A.D.2d at 287, 426 N.Y.S.2d at 283.

The court in this case ruled that "the headlines did not create an impression different from that of the underlying article," and concluded that the article nowhere contained a false statement. We cannot agree.

■ The headline here, *"Grand Jury Probes Embezzlement—Mark Hopkins: Burgess Denies Getting Funds,"* certainly could be read to convey the impression that Burgess was the subject of a grand jury investigation for embezzlement. At the very least, the publication is ambiguous and thus for the jury to construe. See *Lancour*, *supra*, 111 Vt. at 379, 17 A.2d at 256 (if language "admits of more than one meaning, it is, when necessary to ascertain the meaning, for the jury to say what it means . . . ."); *Lent*, *supra*, 143 Vt. at 548, 470 A.2d at 1169 ("question of whether an ambiguous writing is defamatory or not is a jury question . . . ."). Consequently, the matter must be remanded to the trial court for further proceedings in accordance with this opinion.

We do not intend to deter trial judges from entertaining summary judgment motions in defamation suits in appropriate cases. See *Burns*, *supra*, 139 Vt. at 385, 430 A.2d at 775 ("question of whether a plaintiff is a public figure or public official is a constitutional issue to be decided by the trial judge upon motions for summary judgment or directed verdict."). "[S]ummary judgment has been, and should continue to be, the rule" in public figure defamation in order to shield publishers and allow "breathing space for free expression." See Note, *Public Figure Defamation:*

*Preserving Summary Judgment To Protect Free Expression,* 49 Fordham L. Rev. 112, 132 (1980). We hold only that the trial judge's decision to grant defendants' motion for summary judgment cannot be upheld on the record before us.

*Reversed and remanded.*