588 S.E.2d 197

Quincy **WILSON, Plaintiff Below, Appellant,**

v.

The **DAILY GAZETTE COMPANY,** a West Virginia Corporation, Defendant Below, Appellee.

No. 31045.

Supreme Court of Appeals of West Virginia.

Submitted May 14, 2003.

Decided June 12, 2003.

Dissenting Opinion of Justice McGraw June 13, 2003.

Ancil G. Ramey, Michelle E. Piziak, Steptoe & Johnson, Charleston, West Virginia.

William E. Galloway, Weirton, West Virginia, Attorneys for Appellant.

Rudolph L. DiTrapano, Joshua I. Barrett, Sean P. McGinley, DiTrapano, Barrett & DiPiero, Charleston, West Virginia, Attorneys for Appellee.

DAVIS, Justice:

Quincy Wilson, appellant/plaintiff below (hereinafter referred to as "Mr. Wilson"), appeals an adverse ruling by the Circuit Court of Hancock County which granted summary judgment to the Daily Gazette Company, appellee/defendant below (hereinafter referred to as "The Gazette"). The circuit court's order dismissed Mr. Wilson's defamation claim against The Gazette.[1] Before this Court, Mr. Wilson contends that the circuit court erred in concluding that he was a "public figure," and further erred in concluding that he failed to carry his burden of producing sufficient evidence to establish the element of malice in his defamation claim. Simply put, Mr. Wilson contends that he was not a public figure. Alternatively, if found to be a public figure, he claims to have produced sufficient evidence to meet his burden of establishing malice at the summary judgment stage. After reviewing the briefs and listening to the arguments of the parties, this case is reversed and remanded.

## I.

### FACTUAL AND PROCEDURAL HISTORY

In 1999, Mr. Wilson was a seventeen year old student athlete at Weir High School. Mr. Wilson was a member of the high school's football and basketball teams. As a football player, Mr. Wilson was a co-winner of the Kennedy Award.[2] He received an athletic scholarship to play football at West Virginia University. As a basketball player, Mr. Wilson helped lead his team to the state championship.

On March 18, 1999, Mr. Wilson participated in a statewide championship high school basketball game held in Charleston. At the conclusion of the game, a rumor was circulated that Mr. Wilson "exposed" himself in public during a post-game victory celebration. On March 19, 1999, the Gazette published two articles referencing the rumor that Mr. Wilson had exposed himself after the basketball game.[3] The relevant language from the first article read as follows:

1. The circuit court also dismissed four other theories of liability. Because we decide this case on the defamation theory, we need not separately address the other theories of liability. *See, supra,* note 20.

2. The Kennedy Award is given annually to the State's top prep football player.

3. Both articles were written by Mitch Vingle, a reporter for the Gazette.

Some East Bank fans complained that [Quincy] Wilson exposed himself to the Pioneers' cheering section during Weir's postgame celebration.[4]

The relevant language from the second article read as follows:

4. The full text of the first article appeared as follows:

Civic Center Incident Under Investigation

FROM STAFF REPORTS

Charleston police are investigating lewd gestures allegedly made by at least one Weir High School player following the team's last-second win against East Bank at the state basketball tournament Thursday at the Civic Center.

East Bank principal Neil Hopkins reported the alleged incident involving Weir's Quincy Wilson to Charleston Police.

Some East Bank fans complained that Wilson exposed himself to the Pioneers' cheering section during Weir's postgame celebration.

Charleston Police Detective R.E. Ingram said he will interview a potential witness today and determine if further action is warranted.

"These are some serious allegations you're talking about," Weir coach Jack Kostur said. "Certainly I would not tolerate it if there's any truth to it, but I haven't seen any proof. As far as I'm concerned, its innocent until proven otherwise."

Wilson, a senior who has signed to play football at West Virginia University, was co-winner (along with Nitro's J.R. House) of the 1998 Kennedy Award, given annually to West Virginia's top prep football player.

5. The full text of the second article appeared as follows:

Time To Clean Up Our Trash

Mitch Vingle

I'VE HAD IT.

All of it.

The finger wagging. The grabbing. The middle fingering.

Do me a favor. Take it all and deposit it in the nearest trash compactor.

I've had enough.

Thursday's exhibition at the boys basketball tournament was the capper. Weir's Bill Blakemore nailed an almost-impossible shot to lift his team past East Bank.

But did I interview Blakemore? Did I get you a sense of Blakemore's joy, his exhilaration?

No.

I had to cover the mess at the end of the game. I had to interview Charleston police Detective R.E. Ingram.

Weir's players, rather than run and celebrate with their fans, found themselves rolling around in front of East Bank's fans.

That scene led to taunts from both sides. It led to an allegation that Weir's Ryan Jeter grabbed himself, taunting the East Bank fans, and an allegation that Jeter's teammate and co-

Weir's players, rather than run and celebrate with fans, found themselves rolling around in front of East Bank's fans.

That scene led to taunts from both sides. It led to an allegation that ... co-Kennedy Award winner Quincy Wilson went the extra step and exposed himself.[5]

Kennedy Award winner Quincy Wilson went the extra step and exposed himself.

Today, Ingram is scheduled to interview a potential witness. The police will determine whether action is necessary.

Regardless of the outcome, the situation was ugly. Dog ugly.

And we need to curb this dog.

"At our Sunday coaches meeting," said SSAC executive secretary Warren Carter, "[assistant secretary] Betsy Best stood up and talked about sportsmanship.

"She stood right there and talked about how, in previous years, we've had problems with cheerleaders and mascots going to the opponent's fans and taunting.

"I never thought we'd have to discuss the teams doing that."

In all fairness, Weir's team didn't rush to East Bank's fans.

When the Red Rider players lifted Blakemore in celebration, the party just crashed in front of the Pioneers' fans.

Then the screaming and taunting and gesturing—to whatever degree—took place.

"When something like this happens," said Carter, "it sets us back a couple steps.

"Since I've taken over, I've tried to develop good sportsmanship. But when the kids see the pro players and the college players having problems, they think that's the way to go.

"Now, we've got to go back up and start over."

Of course, few mind a simple arm pump. Or a leap of joy. Or even good-natured trash talking—as long as the dialogue is concluded with a handshake.

Just please, everyone, give your opponents their props.

Give them proper respect. Especially at the high school level.

"I've noticed crowds becoming more volatile," said area official Perry Estep, who is working the tournament. "And I've been disappointed in the administrations. It's tough to find administrators willing to stand up to today's youth."

Estep said coaches and players weren't a big problem this season.

"I had 70 games this season," said Estep. In all those games, I only had two technical fouls on coaches. In about 10 situations, I had objects thrown on the floor. In about 10 others, I had to summon the administration because of fan vulgarity."

The result?

"It's taking families out of high school basketball," said Estep. "You don't see a lot of families going to high school games because of the pro-

Subsequent to the publication of the articles, Mr. Wilson filed a defamation action against the Gazette. After a period of discovery, the Gazette filed a motion for summary judgment. One of the legal issues raised by the Gazette's motion was that Mr. Wilson was a public figure within the meaning of defamation law. The circuit court agreed with the Gazette. Consequently, the circuit held that Mr. Wilson had to show that the publications were made with actual malice. The circuit court ultimately concluded that Mr. Wilson failed to present sufficient evidence to establish actual malice. Therefore, the circuit court granted summary judgment in favor of the Gazette. It is from these rulings that Mr. Wilson appeals.

## II.

### STANDARD OF REVIEW

■ Here, we are asked to review the circuit court's order granting summary judgment in favor of the Gazette. Our cases have made clear that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Insofar as " 'appellate review of an entry of summary judgment is plenary, this Court, like the circuit court, must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.' " *Provident Life and Accident Ins. Co. v. Bennett*, 199 W.Va. 236, 238, 483 S.E.2d 819, 821 (1997) (quoting *Asaad v. Res–Care, Inc.*, 197 W.Va. 684, 687, 478 S.E.2d 357, 360 (1996)). We have made clear that "summary judgment is appropriate [only] if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' " *Pritt v. Republican Nat'l Committee*, 210 W.Va. 446, 452, 557 S.E.2d 853, 859 (2001) (quoting W. Va.R.Civ.P. 56(c)). Further,

"[s]ummary judgment should be denied 'even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom.' " *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995) (quoting *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951)). "The essence of the inquiry the court must make is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Williams*, 194 W.Va. at 61, 459 S.E.2d at 338 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). Moreover, "[a] nonmoving party need not come forward with evidence in a form that would be admissible at trial in order to avoid summary judgment. However, to withstand the motion, the nonmoving party must show there will be enough competent evidence available at trial to enable a finding favorable to the nonmoving party." *Williams*, 194 W.Va. at 60–61, 459 S.E.2d at 337–338 (citations omitted).

■ In this proceeding one of the dispositive issues we are called upon to examine involves the circuit court's determination that Mr. Wilson was a public figure. Courts have generally recognized, and we now hold, that "whether a plaintiff in a defamation action is a public figure is a question of law for the trial court." *Khawar v. Globe Int'l, Inc.*, 19 Cal.4th 254, 79 Cal.Rptr.2d 178, 183, 965 P.2d 696 (1998). *See also State ex rel. Suriano v. Gaughan*, 198 W.Va. 339, 346, 480 S.E.2d 548, 555 (1996) (holding that whether plaintiff is a public figure "can be decided by a court as [a] matter[ ] of law."); *Lundell Mfg. Co., Inc. v. American Broad. Cos., Inc.*, 98 F.3d 351, 362 (8th Cir.1996) ("The determination of a plaintiff's status as a .... public figure is an issue of law."); *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C.Cir.1987) ("Whether

---

fanity and vulgarity and the lack of crowd control."

And that's a shame. I mean, what is high school basketball for if not families and community?

"In our office," said Carter, "we've been dealing with more problems with fans. Refs, meanwhile, have been dealing with more problems with players."

Carter said he will challenge his administrators and coaches after the season.

Will that help?

Probably not. This is the era of WWF.

P.T. Barnum has been traded in for Sable. Pro wrestling shows are where moms and dads take their kids, these days.

As for sportsmanship?

It's just a New World Order.

(and to what extent) a person is a public figure is a matter of law for the court to decide."); *Rebozo v. Washington Post Co.,* 637 F.2d 375, 379 (5th Cir.1981) ("[T]he trial court, not a jury, must determine whether the evidence showed that plaintiff was a public figure.").[6] Consequently, we further hold that "[o]n appeal, the trial court's resolution of disputed factual questions bearing on the public figure determination is reviewed for [clear error], while the trial court's resolution of the ultimate question of public figure status is a question of law subject to [de novo] review." *Khawar,* 79 Cal.Rptr.2d at 183, 965 P.2d 696. With these principles in view, we now turn to the merits of this case.

## III.

## DISCUSSION

### A. Determining Whether Mr. Wilson Was a Public Figure

■ The first issue we must address is whether the circuit court correctly concluded that Mr. Wilson was a public figure[7] for purposes of his defamation claim.[8] At the outset, we follow the general rule among other federal and state jurisdictions by holding that, in a claim for defamation, there are three recognized categories of public figures: "(1) 'involuntary public figures,' who become public figures through no purposeful action of their own; (2) 'all-purpose public figures,' who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts; and (3) 'limited-purpose public figures,' who voluntarily inject

themselves into a particular public controversy and thereby become public figures for a limited range of issues." *Wells v. Liddy,* 186 F.3d 505, 532 (4th Cir.1999). *Accord U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 938 (3d Cir. 1990); *Naantaanbuu v. Abernathy,* 816 F.Supp. 218, 223 (S.D.N.Y.1993); *Metge v. Central Neighborhood Improvement Ass'n,* 649 N.W.2d 488, 495 (Minn.Ct.App.2002); *Gaunt v. Pittaway,* 139 N.C.App. 778, 534 S.E.2d 660, 664–665 (2000).[9] In the instant proceeding, the circuit court's order does not identify the public figure category for Mr. Wilson. Therefore, we must separately examine each category.

**1. All-purpose public figure.** In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the United States Supreme Court established the all-purpose public figure category.[10] The decision in *Gertz* involved a defamation action brought by an attorney who alleged that he was defamed by an article in the defendant's magazine. The article described the attorney as a communist. The lower federal courts granted judgment for the defendant. On appeal to the Supreme Court, one of the issues raised was whether the attorney was a public figure. The evidence on the attorney's status as a public figure revealed that "[h]e served as an officer of local civic groups and of various professional organizations, and he ha[d] published several books and articles on legal subjects." *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013. In its resolution of this issue, *Gertz* created the all-purpose public figure

---

**6.** In *Estep v. Brewer,* 192 W.Va. 511, 453 S.E.2d 345 (1994) (per curiam) we were asked to determine whether the trial court committed error in submitting to the jury an interrogatory which required the jury to determine whether the plaintiff was a public figure. We declined to address the issue after finding it was not properly preserved. This Court made clear in *Estep* that "we do not endorse the submission of such interrogatory by the trial court[.]" 192 W.Va. at 515, 453 S.E.2d at 349.

**7.** This Court has held that "[i]n defamation cases, three types of plaintiffs exist: (1) public officials and candidates for public office; (2) public figures; and, (3) private individuals." Syl. pt. 10, in part, *Hinerman v. Daily Gazette Co., Inc.,* 188 W.Va. 157, 423 S.E.2d 560 (1992).

**8.** Since this defamation action concerns written allegations, this matter is technically a libel claim. *See* Syl. pt. 8, *Greenfield v. Schmidt Baking Co., Inc.,* 199 W.Va. 447, 485 S.E.2d 391 (1997) ("Defamation published in written form, as opposed to spoken form, constitutes libel.").

**9.** *See State ex rel. Suriano v. Gaughan,* 198 W.Va. 339, 347, 480 S.E.2d 548, 556 (1996) (recognizing two of the three types of public figures).

**10.** This Court has not previously addressed *Gertz's* all-purpose public figure category. *But see Havalunch, Inc. v. Mazza,* 170 W.Va. 268, 294 S.E.2d 70 (1981) (providing some general discussion of the all-purpose public figure and limited purpose public figure categories).

category. *Gertz* stated "[i]n some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Gertz*, 418 U.S. at 351, 94 S.Ct. at 3013. *Gertz* further held "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013. In its application of the test for an all-purpose public figure *Gertz* concluded that the attorney was not an all-purpose public figure.

One of the leading cases interpreting the *Gertz* test for determining an all-purpose public figure stated "[t]his test is a strict one." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C.Cir.1980).[11] *See also Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 687 (4th Cir.1989) ("The attainment of general public figure status is not to be lightly assumed, even if the plaintiff is involved in community affairs, and requires clear evidence of such stature."); *National Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F.Supp. 627, 633 (D.Md.1992) ("[T]he evidence standard for determining a general purpose public figure is a strict one, requiring clear and convincing evidence of the general fame and pervasive influence in societal affairs."); *In re Thompson*, 162 B.R. 748, 766 (Bkrtcy.E.D.Mich.1993) ("[This test] sets up what amounts to a fairly strong presumption against a finding of widespread notoriety: a person will not be deemed to be a general-purpose public figure unless there is 'clear evidence of general fame or notoriety in the community.'"); *Burgess v. Reformer Pub. Corp.*, 146 Vt. 612, 508 A.2d 1359, 1361 (1986) ("The test is a stringent one."). *Waldbaum* also held that "[f]ew people ... attain the general notoriety that would make them public figures for all purposes." *Waldbaum*, 627 F.2d at 1296. Consequently, the decision in *Waldbaum* interpreted *Gertz* as holding that an all-purpose "public figure is a well-known

'celebrity,' his name a 'household word.' The public recognizes him and follows his words and deeds, either because it regards his ideas, conduct, or judgment as worthy of its attention or because he actively pursues that consideration." *Waldbaum*, 627 F.2d at 1294. *Accord Kroll Assoc. v. City and County of Honolulu*, 833 F.Supp. 802, 805 (D.Haw. 1993); *Harris v. Tomczak*, 94 F.R.D. 687, 703 (E.D.Cal.1982); *Bowman v. Heller*, 420 Mass. 517, 651 N.E.2d 369, 373 (1995); *Vassallo v. Bell*, 221 N.J.Super. 347, 534 A.2d 724, 733 (1987); *Rutt v. Bethlehems' Globe Publ'g Co.*, 335 Pa.Super. 163, 484 A.2d 72, 80 (1984); *Bay View Packing Co. v. Taff*, 198 Wis.2d 653, 543 N.W.2d 522, 530 (Ct.App. 1995).[12] The decision in *Waldbaum* articulated the following guidelines for helping to determine whether a person is an all-purpose public figure:

In determining whether a plaintiff has achieved the degree of notoriety and influence necessary to become a public figure in all contexts, a court may look to several factors. The judge can examine statistical surveys, if presented, that concern the plaintiff's name recognition. Previous coverage of the plaintiff in the press also is relevant. The judge can check whether others in fact alter or reevaluate their conduct or ideas in light of the plaintiff's actions. He also can see if the plaintiff has shunned the attention that the public has given him and determine if those efforts have been successful.... No one parameter is dispositive; the decision still involves an element of judgment. Nevertheless, the weighing of these and other relevant factors can lead to a more accurate and a more predictable assessment of a person's overall fame and notoriety in the community.

*Waldbaum*, 627 F.2d at 1295.

 In view of the above authorities we hold that, in a defamation action, in order to find that a plaintiff is an all-purpose public figure, a defendant must produce clear evi-

---

**11.** The decision in *Waldbaum* held that the plaintiff, president of the second largest cooperative in the nation, was a limited purpose public figure and not an all-purpose public figure.

**12.** It should be noted that nationwide fame or notoriety is not required. "Rather, the question is whether the individual had achieved the necessary degree of notoriety where he was defamed *i.e.*, where the defamation was published." *Waldbaum*, 627 F.2d at 1295 n. 22.

dence of the plaintiff's general fame or notoriety in the state, and pervasive involvement in the affairs of society. In determining whether a plaintiff is an all-purpose public figure, a trial court may consider (1) statistical survey data concerning the plaintiff's name recognition; (2) evidence of previous coverage of the plaintiff by the media; (3) evidence that others alter or reevaluate their conduct or ideas in light of the plaintiff's actions; and (4) any other relevant evidence.

■ Turning to the case at hand, the evidence submitted by The Gazette, and accepted by the circuit court, revealed that Mr. Wilson: (1) was an outstanding athlete; (2) was a co-winner of the Kennedy Award; (3) led his football team to the state championship; (4) received news coverage of his signing a letter of intent to accept a football scholarship from West Virginia University; [13]

(5) played in the high school championship basketball tournament; (6) his father was a former professional football player; [14] and (7) his athletic accomplishments were posted on a West Virginia University website.[15]

■ The Gazette contends that this evidence was sufficient to establish Mr. Wilson's "prominence and notoriety," thereby making him an all-purpose public figure. We disagree. The Gazette's evidence completely failed to show that Mr. Wilson "occupied a position of such 'persuasive power and influence' that he could be deemed one of that small group of individuals who are public figures for all purposes." *Wolston v. Reader's Digest Ass'n, Inc.,* 443 U.S. 157, 165, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979).[16] This evidence, at best, simply established that in some circles, namely athletics, Mr. Wilson may have achieved a reputation as a

---

**13.** The United States Supreme Court has rejected the argument that holding a few press conferences can transform a person into an all-purpose public figure. *See Time, Inc. v. Firestone,* 424 U.S. 448, 454 n. 3, 96 S.Ct. 958, 965 n. 3, 47 L.Ed.2d 154 (1976) ("Nor do we think the fact that respondent may have held a few press conferences during the divorce proceedings in an attempt to satisfy inquiring reporters converts her into a 'public figure.'").

**14.** The Gazette points out that Mr. Wilson's father, Otis Wilson, played professional football for the Chicago Bears in the 1980's. Other than mentioning this fact, the Gazette has failed to show how Mr. Wilson became an all-purpose public figure as a result of his father's accomplishments. A case on point is *Meeropol v. Nizer,* 560 F.2d 1061 (2d Cir.1977). In *Meeropol,* the two sons of Julius and Ethel Rosenberg (who were executed in 1953 for conspiring to provide national defense information to the Soviet Union) filed a defamation action against several publishers. The action was dismissed by the district court on summary judgment. In their appeal, the plaintiffs argued that they were not all-purpose public figures. The court of appeals found that the plaintiffs were all-purpose public figures (arguably the court should have found the plaintiffs were limited purpose public figures). In doing so, the court of appeals noted that the plaintiffs had published a book about their lives with their parents. Consequently, it was held that "[i]n the course of extensive public debate revolving about the Rosenberg trial appellants were cast into the limelight and became 'public figures' under the *Gertz* standards." *Meeropol,* 560 F.2d at 1066. We interpret *Meeropol* as requiring sufficient evidence of affirmative and widespread public conduct by children of all-purpose public figures in order to establish the

children as all-purpose public figures. In the instant case, there is no actual evidence to establish that Mr. Wilson's father was an all-purpose public figure. Assuming, for the sake of argument, that he was, the Gazette nevertheless failed to produce sufficient evidence of affirmative and widespread public conduct by Mr. Wilson that would link him to his father's status.

**15.** The record is not clear in showing that the circuit court considered this factor. Assuming, however, that the Gazette presented evidence of the West Virginia University website to the circuit court, such evidence is totally irrelevant. The law is clear in holding that "[t]he fame or notoriety achieved by a public figure must have preexisted the allegedly defamatory statements which give rise to the litigation." *Harris v. Tomczak,* 94 F.R.D. 687, 701 (E.D.Cal.1982). *See also Waldbaum,* 627 F.2d at 1295 n. 19 ("The court must examine these factors as they existed before the defamation was published."). Evidence of the publication of Mr. Wilson's biography on a website, *after the alleged defamation,* simply cannot be used to assist in establishing that he is an all-purpose public figure.

**16.** Examples of persons the courts have found to be all-purpose public figures are: Clint Eastwood (*Eastwood v. National Enquirer, Inc.,* 123 F.3d 1249 (9th Cir.1997)); Wayne Newton (*Newton v. NBC, Inc.,* 930 F.2d 662 (9th Cir.1990)); Johnny Carson (*Carson v. Allied News Co.,* 529 F.2d 206 (7th Cir.1976)); William F. Buckley, Jr. (*Buckley v. Littell,* 539 F.2d 882 (2nd Cir.1976)); Chase Masterson (*Carafano v. Metrosplash.com, Inc.,* 207 F.Supp.2d 1055 (C.D.Cal.2002); and Carol Burnett (*Burnett v. National Enquirer, Inc.,* 144 Cal.App.3d 991, 193 Cal.Rptr. 206 (1983)).

quality high school athlete. Evidence of a limited circle of notoriety does not satisfy the high bar outlined by *Gertz* for establishing the all-purpose public figure doctrine. *See Gertz*, 418 U.S. at 351–352, 94 S.Ct. at 3013 ("Although petitioner was ... well known in some circles, he had achieved no general fame or notoriety in the community."); *Time, Inc. v. Firestone*, 424 U.S. 448, 453, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976) ("Respondent did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society[.]"); *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C.Cir.1987) ("William Tavoulareas is a highly prominent individual, especially in business circles, but his celebrity in society at large does not approach that of ... the archetypes of the general purpose public figure.").

**2. Limited purpose public figure.** The limited purpose public figure doctrine was also established by the United States Supreme Court in *Gertz*. *Gertz* opined that "an individual [who] voluntarily injects himself or is drawn into a particular public controversy [may] thereby become[ ] a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351, 94 S.Ct. at 3013. The seminal case by this Court addressing the limited purpose public figure doctrine was authored by Justice Cleckley in *State ex rel. Suriano v. Gaughan*, 198 W.Va. 339, 480 S.E.2d 548 (1996).

■ The plaintiff in *Suriano*, a physician, filed a defamation action against two defendants as a result of published statements the defendants made about the plaintiff's withdrawal from participation in state-sponsored healthcare programs. The case languished for several years in the trial court before the defendants filed for a writ of prohibition with this Court. The writ of prohibition sought to prevent the case from going to trial. One of the issues addressed in *Suriano* was the defendants' contention that the plaintiff was a limited purpose public figure. In order to determine whether the plaintiff was a limited purpose public figure, Justice Cleckley adopted the following test in syllabus point 3 of *Suriano*:

A libel plaintiff is a limited purpose public figure if the defendant proves the following:

(1) the plaintiff voluntarily engaged in significant efforts to influence a public debate—or voluntarily assumed a position that would propel him to the forefront of a public debate—on a matter of public concern;

(2) the public debate or controversy and the plaintiff's involvement in it existed prior to the publication of the allegedly libelous statement; and

(3) the plaintiff had reasonable access to channels of communication that would permit him to make an effective response to the defamatory statement in question.

Under the *Suriano* test, the Court ruled that the plaintiff was a limited purpose public figure. The evidence in *Suriano* established that a controversy regarding state healthcare coverage *existed prior to the alleged defamatory statements*, that the plaintiff voluntarily injected himself into the debate, and that the plaintiff had access to the media. Evidence of the plaintiff's involvement in the controversy was summarized as follows:

It is clear, too, that Dr. Romano voluntarily thrust himself into the debate and sought to influence its outcome. Indeed, he was aggressively involved. The quantity of his letter writing to newspapers, professional journals and organizations, fellow physicians, and government officials regarding the controversy was impressive and demonstrated an active engagement in the PEIA controversy. Indeed, the record contains at least fifty examples of such correspondence. In these letters, Dr. Romano set forth his views regarding state-funded health care, his perception of the oppressive restrictions imposed by the West Virginia Omnibus Health Care Act and federal Medicare regulations, explained his reasons for withdrawing from these programs, and frequently exhorted others to join his protest.

*Suriano*, 198 W.Va. at 349–350, 480 S.E.2d at 558–559.[17]

---

**17.** The Court ultimately granted the writ requested in *Suriano* and precluded the case from going any further.

In the instant proceeding, The Gazette failed to satisfy the *Suriano* factors. In fact, the Gazette does not present any argument that would suggest it satisfied the *Suriano* factors. No evidence existed to show that Mr. Wilson voluntarily injected himself into a controversy regarding "sportsmanship." [18] There was also no evidence to show that a controversy existed regarding sportsmanship, *prior* to the publication of the Gazette's articles. The law is clear in holding that "a plaintiff should not be considered a limited-purpose public figure absent the existence of a pre-defamation public controversy in which the plaintiff has become directly involved." *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 688 (4th Cir.1989). *See also Worldnet Software Co. v. Gannett Satellite Info. Network, Inc.*, 122 Ohio App.3d 499, 702 N.E.2d 149, 155 (1997) ("It is important to note that a plaintiff does not become a public figure merely because the allegedly defamatory statements create a controversy; the controversy must have existed prior to the statements.").

The Gazette urges this Court to carve out an exception to the *Suriano* factors and hold that "amateur athletes like [Mr. Wilson], are public figures when they participate voluntarily in public sporting events." In other words, The Gazette seeks to have this Court hold that all non-professional athletes are limited purpose public figures. To support its argument, The Gazette cites to the decision in *Holt v. Cox Enterprises*, 590 F.Supp. 408 (N.D.Ga.1984).

*Holt* involves a complicated set of facts. Reduced to their working essence, those facts are as follows. The plaintiff in *Holt* was a football player for the University of Alabama. During a highly publicized game in 1961, between Alabama and Georgia Tech, the plaintiff struck an opponent in the face with his forearm. The blow struck by the plaintiff broke the opponent's jaw and nose, and knocked out several teeth. The game officials did not call a penalty on the plaintiff. For several years after the game, numerous articles were written about the plaintiff's conduct in striking the opponent, as well as the officials' failure to call a penalty. The controversy resurfaced in 1979. Then, the plaintiff granted an interview with a sportswriter. As a result of the interview, five articles were published about the 1961 incident. Subsequent to those 1979 publications, the plaintiff filed a defamation action against two newspaper companies and a reporter. Mr. Holtz alleged that their descriptions of the 1961 incident were false and defamed him.

The defendants in *Holt* moved for summary judgment. One of the issues the federal district court had to address, was whether or not the plaintiff was a limited purpose public figure. In a rather convoluted manner, the district court ultimately found that the plaintiff was a limited purpose public figure. In dicta, the district court stated that, as a college football player, the plaintiff became a limited purpose public figure "when he first engaged in the sport." *Holt*, 590 F.Supp. at 412.[19] It is this "dicta" that the Gazette seeks for this Court to adopt. For the reasons set forth below, we decline to do so.

In our review of *Holt* we find that the evidence supported finding the plaintiff was a limited purpose public figure. A controversy had existed for years regarding the 1961 incident. The plaintiff voluntarily interjected himself into the debate. The plaintiff had access to the media. With this evidence clearly established, the district court did not have to speculate nor suggest that all nonprofessional athletes are limited purpose public figures. Furthermore, the dicta language contained in *Holt has not been adopted by any court in the country*. In fact, only five courts have cited *Holt*. Not one of those five have adopted *Holtz's* dicta suggesting that merely playing in nonprofessional sports makes an individual a limited purpose public figure. *See Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 619 (2nd Cir.1988) *Washington v. Smith*, 893 F.Supp. 60, 63 (D.D.C.1995); *Don*

---

18. From our review of both articles published by the Gazette, we have determined that the overriding theme of the articles involved sportsmanship.

19. The district court granted summary judgment to the defendants.

*King Prods., Inc. v. Douglas,* 742 F.Supp. 778, 783 (S.D.N.Y.1990); *Pesta v. CBS, Inc.,* 686 F.Supp. 166, 169 (E.D.Mich.1988); *Warford v. Lexington Herald–Leader Co.,* 789 S.W.2d 758, 770 (Ky.1990). Moreover, the dicta in *Holt* is inconsistent with *Gertz.* The central requirement imposed by *Gertz* for labeling a person a limited purpose public figure is that there must be "a particular controversy." *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013. The mere fact of playing on a high school football team, or little league baseball team, or a college golf team, is not in and of itself a controversy.

**3. Involuntary public figure.** The involuntary public figure doctrine has its origins in one sentence from the United States Supreme Court decision in *Gertz:* "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009. *Gertz's* recognition that an involuntary public figure is rare has been supported by subsequent case law. That is, only a handful of courts have ever found a plaintiff to be an involuntary public figure. *See Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 742–43 (D.C.Cir.1985) (holding airport controller on duty during plane crash to be an involuntary public figure); *Carson v. Allied News Co.,* 529 F.2d 206, 210 (7th Cir.1976) (wife of Johnny Carson held to be an involuntary public figure); *Zupnik v. Associated Press, Inc.,* 31 F.Supp.2d 70, 73 (D.Conn. 1998) (wife involuntary public figure because of spouse's notoriety); *Atlanta Journal–Constitution v. Jewell,* 251 Ga.App. 808, 555 S.E.2d 175, 186 (2002) (security guard held to be involuntary public figure); *Daniel Goldreyer, Ltd. v. Dow Jones & Co., Inc.,* 259 A.D.2d 353, 687 N.Y.S.2d 64, 65 (1999) (art restorer held to be involuntary public figure); *Bay View Packing Co. v. Taff,* 198 Wis.2d 653, 543 N.W.2d 522, 532–34 (Ct.App.1995) (holding food processing company was involuntary public figure).

The leading case to explore the contours of the involuntary public figure doctrine is *Wells v. Liddy,* 186 F.3d 505 (4th Cir.1999). In *Wells,* the plaintiff filed a defamation action against the defendant, G. Gordon Liddy, over statements he made about the plaintiff in his talks about the 1972 Watergate break-ins. The federal district court granted the defendant summary judgment after finding the plaintiff was an involuntary public figure and that she failed to prove actual malice. The plaintiff appealed to the Fourth Circuit Court of Appeals. Prior to addressing the issue of whether the plaintiff was an involuntary public figure, the Fourth Circuit adopted the following test for establishing a plaintiff as an involuntary public figure:

> First, to prove that a plaintiff is an involuntary public figure the defendant must demonstrate to the court that the plaintiff has become a central figure in a significant public controversy and that the allegedly defamatory statement has arisen in the course of discourse regarding the public matter. To prove that the plaintiff is a central figure in the controversy, the defendant must put forth evidence that the plaintiff has been the regular focus of media reports on the controversy.... Second, although an involuntary public figure need not have sought to publicize her views on the relevant controversy, she must have nonetheless assumed the risk of publicity. Therefore, the defendant must demonstrate that the plaintiff has taken some action, or failed to act when action was required, in circumstances in which a reasonable person would understand that publicity would likely inhere.

*Wells,* 186 F.3d at 539–540. Applying its test to the facts presented, the Fourth Circuit concluded that the plaintiff was not an involuntary public figure because she "simply has not been a central figure in media reports on Watergate." *Id.,* 186 F.3d at 540.

■ Therefore, we hold that in a defamation action, to prove that a plaintiff is an involuntary public figure, the defendant must demonstrate by clear evidence that (1) the plaintiff has become a central figure in a significant public controversy, (2) that the allegedly defamatory statement has arisen in the course of discourse regarding the public matter, and (3) the plaintiff has taken some action, or failed to act when action was required, in circumstances in which a reason-

able person would understand that publicity would likely inhere.

 Applying the above test to the facts of the instant case, we find that Mr. Wilson was not an involuntary public figure. Nothing in the record remotely suggests that Mr. Wilson was a "central" figure in any purported public controversy involving sportsmanship that existed prior to the Gazette's publications.

**4. Summation.** The trial court's summary judgment order concluded that Mr. Wilson was a public figure. The order failed to state within which of the three public figure categories Mr. Wilson could be categorized. Consequently, we deemed it necessary to examine the evidence under all three public figure categories. From our analysis of the evidence, we have determined that the Gazette failed to show by clear and convincing evidence that Mr. Wilson fit under any of the three recognized public figure categories. Further, we have declined the Gazette's invitation to adopt a specific public figure category for nonprofessional athletes.[20] Therefore, we conclude that Mr. Wilson was not a public figure at the time of the alleged defamatory publications, and the trial court committed error in so finding.

### B. Requiring Mr. Wilson to Prove Actual Malice

 The trial court found that, because Mr. Wilson was a public figure, he had to prove actual malice, and that he failed to do so. We have found that Mr. Wilson was not a public figure. Instead, he was a private individual at the time of the alleged defamatory publications. This Court recognized the significance between a public figure and a private individual in syllabus point 2, in part, of *Suriano* as follows:

> Plaintiffs who are ... public figures must prove by clear and convincing evidence that the defendants made their defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not. Private figures need only show that the defendants were negligent in publishing the false and defamatory statement.[21]

By labeling Mr. Wilson a public figure, the circuit court required him to establish that the Gazette's publications were done with actual malice, as opposed to the lower standard of negligence. This was error. Mr. Wilson's burden is that of merely showing the publications were done negligently.[22]

20. The Gazette has also argued that this Court should hold that Mr. Wilson is a public figure because his counsel purportedly admitted that he was a public figure during the hearing on the motion for summary judgment. We disagree. The passage from the hearing cited by the Gazette only shows Mr. Wilson's counsel speaking in hypothetical terms.

Additionally, the Gazette contends that summary judgment was appropriate because the publications did not contain false statements. During oral argument to this Court, counsel for Mr. Wilson noted that the Gazette did not properly set out the issue of falsity as a cross assignment of error in its brief, consequently the issue is not properly before this Court. We agree. However, for the sake of argument, even if the issue was properly raised as a cross assignment of error, we would not disturb the circuit court's ruling on the matter. The circuit court's summary judgment order found that the issue of falsity presented a jury question:

The Court concludes as a matter of law that the issue of fact concerning a falsehood could get to a jury based on the *Hinerman* case. The Court concludes as a matter of law that a fair reading of the article could indicate that the writer was intimating that he knew more about the case especially the portion of the column that refers to the writer having to stop what he was doing to report the incident.

The record supports this finding by the circuit court.

21. "The distinction between public and private figures is justified on two grounds. First is the rationale of self-help. Public figures have greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Second, and perhaps more important, is the notion of assumption of risk.... [P]ublic figures in some sense voluntarily put themselves in a position of greater public scrutiny and thus assume the risk that disparaging remarks will be negligently made about them." *McDowell v. Paiewonsky*, 769 F.2d 942, 947–948 (3d Cir.1985) (citations and internal quotation marks omitted).

22. Insofar as the trial court dismissed Mr. Wilson's other theories of liability upon its erroneous resolution of the public figure/actual malice issues, those theories are also reinstated.

## IV.

### CONCLUSION

We conclude that the circuit court committed error in ruling that Mr. Wilson was a public figure and that he had to establish actual malice. Therefore the circuit court's order granting the Gazette summary judgment is reversed and this case is remanded for proceedings consistent with this opinion.

Reversed and Remanded.

Justice McGRAW and Justice ALBRIGHT dissent and reserve the right to file dissenting opinions.

McGRAW, Justice, dissenting:

(Filed June 13, 2003)

As undesireable as I believe it is to make young high school students public figures, I believe that, in fact, is what our society has done. Consequently, I believe that the student involved in the present case should be so categorized.

For the foregoing reason, I respectfully dissent. I am authorized to state that Justice Albright joins me in this dissent.